[No. 26649. Department Two. August 31, 1937.]

CARRIE L. CAYLOR, *as Administratrix, et al., Respondents,* v. B. C. MOTOR TRANSPORTATION, LTD., *et al., Appellants,* GRAYDON BLACKLEY, *Defendant.*[1]

[1]Reported in 71 P. (2d) 162.

366

Ballinger, Hutson & Boldt, Sather & Livesey, Walter B. Whitcomb, and Roberts & Skeel, for appellants.

Shank, Belt, Rode & Cook and John P. McGlinn, for respondents.

Steinert, C. J.—Five actions were instituted in the superior court to recover damages for personal injuries to four individuals and the death of a fifth and for the demolition of an automobile, all resulting from a collision in which two automobiles and a stage were involved. The actions were consolidated and tried before a jury. A challenge to the sufficiency of plaintiffs' evidence and a motion for directed verdict for defendents having each been denied, the causes were submitted to the jury, which returned separate verdicts for the respective plaintiffs. After motion for judgments notwithstanding the verdicts had been interposed and denied, judgments were entered, from which two of the defendants have appealed.

On the night of April 26, 1936, shortly before eleven o'clock, Garland M. Caylor, Carrie L. Caylor, his wife, Clarence E. Baller, Minnie E. Baller, his wife, and the

two Baller children, Billy, eighteen years of age, and Barbara, were riding in a Chevrolet automobile, owned by Mr. Baller and driven by Billy, south along the Pacific highway from Blaine toward Bellingham. At the same time, a stage, owned by appellant B. C. Motor Transportation, Ltd., and operated by its driver Clarence B. Bicknell, also an appellant herein, was proceeding north along the highway from Bellingham toward Vancouver. Some distance back of the stage, defendant Graydon Blackley, accompanied by his wife and child, his sister-in-law, and a man by the name of Burns, was driving a Hudson automobile from Bellingham north toward Vancouver, where the Blackleys resided.

At a point designated as Giles Corner, which is on the highway and about four and one-half miles south of Blaine, the stage stopped to discharge a passenger. The Hudson automobile, traveling at an excessive rate of speed, crashed into the left rear end of the stage and caromed over onto the west side of the highway just at the time when the Chevrolet, proceeding south, was passing the stage.

The two private automobiles collided with such terrific force that both of them were practically demolished. Mr. Caylor was killed instantly, and the other occupants of the Chevrolet were seriously injured. The effect upon the occupants of the Hudson automobile was equally disastrous. Mrs. Blackley was killed instantly, Mr. Burns died within three or four hours, and the other three were variously wounded.

These actions were subsequently brought by or on behalf of the occupants of the Chevrolet car against the stage company and its driver and also against Blackley, the owner of the Hudson car. Service of process was never obtained upon Blackley, he being a resident of Vancouver, and the actions therefore pro-

ceeded to trial against the stage company and its driver only.

The assignments of error are predicated solely on the ground that the judgments are not sufficiently supported by the evidence in the following particulars: (1) that there was no evidence to support a finding of negligence on the part of appellants; (2) that there was no proximate causal relationship between the alleged negligence of appellants and the injuries and damages alleged in the complaint; and (3) that the conceded and undisputed negligence of Blackley was the sole, independent and intervening cause of the accident. The specific contentions advanced by appellants will be noticed later.

The nature and scope of the assignments of error necessitate a somewhat extended statement of the case. As we proceed with the statement, we shall call attention to such facts as are in dispute.

Pacific highway, in the vicinity where the accident occurred, runs in a northerly and southerly course and for a considerable distance in either direction is straight and practically level. About a half mile south of Giles Corner, there is a slight, but hardly perceptible, rise in the pavement. The highway is paved with concrete to a width of twenty feet, on each side of which are dirt shoulders of varying width and firmness.

Giles road, which is gravel surfaced, comes into Pacific highway from the southeast at an angle of about forty-five degrees, according to the map in evidence. Its exit from the highway is approximately one hundred or one hundred and twenty-five feet further north. As the graveled road coming from the southeast nears the highway, it flares out in an irregular funnel shape which, for better illustrative purposes, may be compared to the foot and lower part of the

human leg flexed downward at the ankle, the heel representing the southerly contact of the road with the highway and the toes its northerly contact. Before the widening of Giles road begins, the traveled portion thereof is about thirteen feet wide; at a point fifteen feet east of the pavement, it is thirty-two feet wide; at a point six feet, three inches east of the pavement, it is fifty-three feet in width; and at the edge of the pavement, it is one hundred eight and one-half feet in width. The east shoulder of Pacific highway is thus graveled for a distance of one hundred eight and one-half feet at the place designated as Giles Corner.

Along the east shoulder of the highway and extending south from the south margin of Giles road a distance of two hundred and seventy feet, there is a wooden guard-rail two feet, eight inches high. This guard-rail is set four feet, ten inches from the edge of the pavement, except at its extreme north end, at the margin of Giles road, where it is six feet, three inches from the pavement. In this vicinity, the shoulder between the pavement and guard-rail is solid and firm, though spotted with grass.

North of Giles road and east of the highway, there is no guard-rail. The shoulder of the highway at that point is about seven and one-half feet wide, the outer edge being three inches lower than at the pavement. Except for that part of it which lies within the graveled portion of Giles road, the shoulder is covered with grass and is more or less soft. Beyond the edge of the shoulder, the ground drops into a water ditch about three feet deep.

Along the west shoulder of the highway and extending south from the westerly stretch of Giles road a distance of three hundred and sixty-nine feet, there is a similar guard-rail set four feet, ten inches from the westerly edge of the pavement.

On the night of the accident, the weather was fair, the atmosphere was clear, and there was partial moonlight. There was no obstruction of any kind to vision along the highway. A lighted vehicle or object on the highway could be seen distinctly for at least a half mile to the south and for even a greater distance to the north.

Appellant's stage had a wheel-base length of twenty-one feet, two inches and an over-all length of thirty-two feet. It was eight feet wide and approximately eight feet, six inches in height. On the rear, and near the top, of the stage, there were two large red marker lights, one on each side. The tail light, also red, was three feet, two inches from the ground and had a stop-light mechanism which caused the light to flare a brighter red when the brakes were applied. Inside the stage, there were several dome lamps which, when the electric current was on, emitted light through the windows on the side and a large window in the rear. The rear wheels of the stage were of the dual type. The gross weight of stage, passengers and baggage on the night of the accident was about 17,500 pounds.

Giles Corner was a regularly designated tariff point or stopping place of appellant's stage line, under the provisions of the permit and regulations issued by the state department of public works.

The stage left Bellingham on schedule time, 10:25 p. m., and proceeded north in its usual way to Custer, which is three miles south of Giles Corner. At a point about four miles south of Custer, the stage had passed the Hudson car, or one of similar type, and about a mile further on had passed a motorcycle driven by one Jack Wall, who later saw the accident. At Custer, the stage stopped to discharge several passengers, and, during the period of its stop, the motorcycle overtook and passed it. About half way between Custer and Giles

Corner, the stage, traveling at the rate of forty miles an hour, again passed the motorcycle, and shortly thereafter, Blackley, driving the Hudson car at an excessive rate of speed, also passed the motorcycle.

As the stage came within a half mile of Giles Corner, where it was to stop in order to discharge a passenger, the driver, looking into his mirror, saw the motorcycle approaching about one hundred yards in the rear, followed by the Hudson car about two hundred and twenty yards further back. The stage driver applied his brakes and gradually slowed down to a stop at a point about eight feet north of the southerly edge of Giles road. In the meantime, he had switched on his dome lights, thus increasing the illumination and visibility of the stage. The stage came to a full stop on the highway at the edge of the pavement bordering the entrance of Giles road, with only the outside portion of the right rear dual wheel extending over onto the graveled road.

The driver opened the door, and Frank Allen, a passenger, at once stepped out. The door was then closed, and Allen proceeded to walk south toward the back end of the stage, intending to cross the highway and pursue his way to and along the westerly stretch of Giles road. After he had proceeded three or four steps along the side of the stage, Allen heard the roar of the approaching Hudson car and noticed that it was traveling at a high rate of speed. Instinctively he turned and ran up the Giles road for about fifteen feet, where he paused in time to see the collision. At about the same time, Jack Wall, approaching on his motorcycle from behind the Hudson, observed the speed at which Blackley was traveling and also saw the collision. Whether the stage was actually at a stand-still at the instant of the impact, or whether it had then begun to move, is in dispute.

■ We now take up the specific contentions made by appellants under their respective assignments of error. In the consideration of these contentions, we are governed by certain well-established principles of law.

Where the evidence upon an issuable fact is conflicting, and where the minds of reasonable men may differ thereon, the question is one for the jury to determine. *Bell v. Northwest Cities Gas Co.*, 164 Wash. 450, 2 P. (2d) 644.

In passing on a motion for judgment notwithstanding the verdict, all material evidence favorable to the contention of the party benefited by the verdict must be taken as true and, from such evidence, all reasonable inferences most favorable to such party must be indulged. *Boyd v. Cole*, 189 Wash. 81, 63 P. (2d) 931.

The first contention made by appellants is that, at the time of the collision, the stage was moving forward. It is the theory of appellants that, unless the stage was actually at a stand-still at the instant of impact, the entire basis of respondents' actions is swept away.

For the purposes of this case, it is unnecessary to determine whether negligence, if any, in stopping upon a highway ceases the moment the vehicle starts to move forward, and we express no opinion thereon. We limit ourselves upon this phase of the case to the question whether or not the stage had started or was proceeding forward at the time that the collision occurred.

Seven witnesses testified upon that question, either upon direct or on cross examination, or both. Appellant Bicknell, the stage driver, testified that the stage had started up from its stop and had proceeded forward about fifteen feet, going at the rate of from three to five miles an hour, when it was struck in the rear. George Morton, a passenger on the stage, testified that, at the

time of the collision, the stage had been put into gear and had slowly moved forward a distance of six to eight feet. Frank Allen, the passenger who had disembarked, was interrogated upon the question, but stated that he could not say whether the stage was actually moving at the time or not. J. N. Turvey, another stage passenger, testified that he *believed* that the stage was stopped at the time. Louis G. Potter, a fourth stage passenger, testified that while the stage was stopped he felt a jar as though someone had kicked him in the back. Asked specifically as to whether the stage was moving or stopped at the time that he felt the jar, he said that it was stopped.

Charles L. Woodward, a highway patrolman, who appeared upon the scene after the accident, testified that he then and there talked to the stage driver, and that the latter told him that he had stopped to let off a passenger, and that the car coming from the south crashed into the rear end of the stage and sheered off into the Chevrolet; that, upon being struck in the rear, the stage moved ahead several feet. The officer further testified, however, that, on the day following the accident, the stage driver had told him that the stage was slowly moving ahead when the crash occurred. William Breuer, another highway patrolman, testified that, while he was at the scene of the accident, he talked to the stage driver and understood him to say that "he had moved the stage up approximately fifteen feet." There was further evidence from a number of other witnesses concerning the position of the stage after the collision, much of which tended to prove that the stage was not moving forward at the moment of collision.

The conflict in the evidence, as just summarized, is apparent, and it follows that it presented a question for the jury, and that the motion for judgment notwith-

standing the verdict can not be granted on the first ground presented.

The appellants next contend that the evidence was insufficient to establish negligence on their part in bringing the stage to a stop on the highway and failing to pull off onto the graveled section included in the funnel-shaped portion of Giles road where it neared the intersection. This contention may be resolved into two questions: (1) Was it reasonably possible for the stage to pull off the highway at that point? and (2), if so, was it negligence under the circumstances not to pull off before coming to a stop?

The stage, it will be remembered, was thirty-two feet long and eight feet wide. The size and shape of the mouth of Giles road have already been given, but to visualize the physical conditions with any degree of accuracy, a resort to the map in evidence· is necessary, and to fully understand and appreciate the true situation, one would probably have to see the actual location on the ground.

It is apparent to us from a study of the map that it would be possible to place the stage wholly within the graveled section at its widest portion in a position parallel and next to the edge of the pavement, but to do so would either require that the stage be moved laterally from the highway or else maneuvered by a series of forward and backward movements. The stage driver testified that on one other occasion he had driven off the highway at that point to the extent that the right side of the stage was two feet off the pavement, but, according to his statement, that was the best that could be done. The witness Allen, who was the passenger that had been let off the stage upon the particular occasion, testified that at another time, and under similar circumstances, he had seen the stage entirely off the highway and on the graveled road. There was evidence

in the case that the ambulance which came to the scene on the night of the accident had passed around the east side of the stage over the graveled road and then onto the highway back of the stage where the injured persons lay.

But whether or not the stage could have gotten entirely off the pavement at that point without maneuvering at some inconvenience and some possible risk to traffic from the rear is not, in our opinion, determinative of the question before us. It does appear to us from the evidence, particularly from a study of the many photographic exhibits, that the stage could have gotten partially off the pavement, to the extent of at least four feet and probably more, without any difficulty or without interfering with its ability to get back onto the highway in a continuous forward movement. If such turn were contemplated at some distance back, or south, of Giles road, the portion of the hard dirt shoulder on the right side was available. If it were desired to make the turn a little nearer the intersection, it could have been accomplished by approaching along a line a little further out toward the center of the pavement.

In our opinion, the evidence was ample to justify the jury in finding that it was practicable and reasonable to pull off part way onto the graveled section of Giles road without at all interfering with the usual and customary operation of the stage or without any danger to traffic. In any event, it is impossible for us to say, in passing on the motion for judgment notwithstanding the verdict, that it was impracticable and impossible, upon any reasonable hypothesis, to do so.

The question then naturally arises whether it was negligence on the part of the stage driver, under the circumstances, not to pull off the highway.

On cross-examination, the stage driver testified as follows:

"Q. What are your regulations about stopping your bus upon the paved portion of the highway? . . . A. Our instructions are that wherever there is a sufficient room to drive the bus off the pavement that we are to drive it off. Q. . . . You are to get off if you can? A. Yes. . . . A. The rules cover quite a bit of territory; that we are to always stop at the extreme right side of the pavement or improved portion of the road and wherever possible to drive off the pavement entirely. Q. . . . In other words, to get off when you can before you stop? A. Yes, sir."

If it was the rule or custom to pull off the highway entirely whenever it was possible, it would seem to follow that the driver would be expected to pull off partially whenever the need and opportunity to do so were presented. While neither the rule nor the law would compel the impossible in any instance, yet by the same token it would require that which could reasonably be done under the circumstances.

There are, in our opinion, at least three reasons why the stage should have been pulled off the highway as far as possible and practicable. In the first place, it would have afforded that much additional space upon the highway for use by passing traffic. In the second place, a lighted object partially off the highway would more readily suggest to oncoming traffic that it was motionless than it would if it were entirely on the highway. It is a matter of common knowledge that at night there is an appreciable length of time when it is impossible, or at least difficult, for a driver to determine with accuracy whether a lighted object some distance ahead is moving or not. In the third place, if a stage were even partially off the highway and standing still, a driver approaching it from the front and observing that other traffic was approaching from the

opposite direction, would have some opportunity of altering his speed or position on the highway, on seeing that an approaching car was attempting to pass the intervening lighted object. These, and probably many other, reasons and circumstances might well be taken into consideration by the jury, in determining whether there was negligence, in a given instance, in failing to pull entirely or partially off the highway where it was reasonably possible to do so. Taking into consideration all of the circumstances, we think that, upon this particular phase of the case, it was a question for the jury, and that it could not be disposed of as a matter of law.

Appellants finally contend that, despite everything thus far discussed, there was no proximate causal relationship between their alleged negligence and the injuries and damages set forth in the complaint.

Many cases from foreign jurisdictions are cited in support of this contention, but it is unnecessary to discuss them, because we have an abundance of authority establishing the law in this state upon the question involved.

It may be assumed, for the purposes of this case, that Blackley, the driver of the Hudson car, was guilty of the most flagrant negligence. But that fact alone, however important it might be in a suit brought by Blackley, is not decisive of this case. We have here the question whether appellants were negligent and, if so, the further question whether such negligence was the proximate cause of the injuries and damages sustained by wholly innocent persons.

When the negligence of one person concurs with that of another to produce the proximate cause of injury to a third person, each of the persons found to be negligent is chargeable as if solely responsible for such cause. *Jaquith v. Worden,* 73 Wash. 349, 357,

132 Pac. 33, 48 L. R. A. (N. S.) 827; *Hellan v. Supply Laundry Co.*, 94 Wash. 683, 686, 689, 163 Pac. 9; *Anderson v. McLaren*, 114 Wash. 33, 194 Pac. 828; *Hadley v. Arms & Scott*, 136 Wash. 632, 641, 241 Pac. 26; *Watkins v. Interstate Coach Co.*, 145 Wash. 221, 259 Pac. 393; *Newkirk v. Workman*, 149 Wash. 84, 270 Pac. 125; *Gabrielsen v. Seattle*, 150 Wash. 157, 166, 272 Pac. 723, 63 A. L. R. 200; *Lindsey v. Elkins*, 154 Wash. 588, 596, 283 Pac. 447; *Todd v. Alexander*, 160 Wash. 3, 8, 294 Pac. 545; *Baker v. Royal Blue Cab & Blue Line Sightseeing Co.*, 163 Wash. 95, 99, 300 Pac. 167; *Young v. Smith*, 166 Wash. 411, 417, 7 P. (2d) 1; *Thornton v. Eneroth*, 177 Wash. 1, 10, 30 P. (2d) 951.

Each of these cases grew out of a collision in which one or more automobiles were involved, and the principle above announced was fully discussed and clearly recognized as being the law in this state.

The question of proximate cause is a mixed question of law and fact, and it is usually a question for the jury. It is only when the facts are undisputed and the inferences therefrom are plain and incapable of reasonable doubt or difference of opinion that it may become a question of law for the court. *Hellan v. Supply Laundry Co.*, 94 Wash. 683, 686, 163 Pac. 9.

While the facts in this case are not greatly in dispute, the inferences to be drawn from all the facts disclosed by the evidence and the surrounding circumstances, taken as a whole, made the question, in our opinion, peculiarly one for the jury.

Indeed, we think that, but for the position of the stage blocking the highway as it did, the accident would not have occurred; further, that a rear-end collision, with its consequences to other users of the highway, was, under the circumstances, sufficiently within the range of probability that the stage-driver, in the exercise of ordinary care, should have foreseen or

reasonably anticipated it and governed himself accordingly. Since the jury was entitled to find that his failure to pull off, at least partially, from the highway was negligence, it was logical, we think, for the jury to find, as it manifestly did, that appellants' negligence was a proximate cause of the damages and injuries sustained.

The motion for judgment notwithstanding the verdicts was vigorously argued before the trial court and, after mature consideration, as the oral decision appearing in the statement of facts discloses, was denied. We find no legal ground for disturbing the ruling of the trial court.

The judgments are affirmed.

ROBINSON, HOLCOMB, MAIN, and BEALS, JJ., concur.

