[No. 27043. *En Banc.* December 2, 1938.]

HORTELIA BRACY, *Respondent*, v. CHARLES A. LUND, *Defendant*, SMART'S AUTO FREIGHT COMPANY, *Appellant*.[1]

*Poe, Falknor, Emory & Howe,* for appellant.

*S. A. Gagliardi,* for respondent.

ROBINSON, J.—This is an action to recover damages for personal injuries.

[1] Reported in 84 P. (2d) 670.

A truck and trailer were stalled on a bridge of such width that a space of at least twenty-three feet was left for other traffic. Two meeting automobiles, for some reason, found that space insufficient to pass each other and came into a head-on collision, or, rather, a partly head-on collision, since photographs of the automobiles show that the front wheel, running-board, and fenders were stripped off the left, or driver's side of each car. Neither automobile came in contact with the truck or trailer.

Hortelia Bracy, a passenger in one of the automobiles, brought this suit against Charles A. Lund, the driver of the other, and joined Smart's Auto Freight Company, Inc., the owner of the truck, as an additional defendant. The jury exonerated Lund, but returned a verdict against the auto freight company. It prosecutes this appeal from the judgment rendered thereon.

The truck and trailer, being of an over-all length of sixty-five feet, were standing at the easterly end of the long bridge which carries the Pacific highway over the Puyallup river and its adjacent flats. Going toward Seattle, the bridge proper ends with the river span, and an incline, 560 feet long, leads down a five per cent grade to the double roadway. The truck was standing on the incline and the trailer was still on the level bridge. At that point, the roadway is thirty-six feet in width and so continues for a distance of 431 feet down the incline. There, the sidewalks come to an end and the roadway becomes forty-four feet wide. About 130 feet farther on, the roadway divides into two twenty-two foot strips of pavement, with a gravel strip two or three feet wide between them, and so continues toward Seattle. On the bridge, the yellow line is in the middle of the roadway, leaving a space of eighteen feet on each side. Near the bottom of the incline, the line splits into two outward curving lines, each of

which leads to, and continues along, the middle of the two twenty-two foot strips of pavement which constitute the Tacoma-Seattle road.

One approaching the truck and trailer from Tacoma could have seen the rear of the trailer for at least one thousand feet, and one approaching them from the opposite direction could have seen the front of the truck for a long distance, for in that direction the road is practically straight for several miles. At the time, the truck's marker lights were burning, and from various parts of the truck and trailer twenty-seven small green lights showed ahead and seventeen red lights showed behind. It was just past daybreak, and the truck and trailer could have been plainly seen for a long distance had they carried no lights at all.

Klimmer, the driver of the truck, had brought the truck and trailer from Portland during the night, having left there at eight the previous evening, January 19, 1937. He testified that it was a cold night, and that, when he arrived at that point on the bridge, his Diesel engine stopped dead. When this occurred, the truck had entered upon the incline, and, although the trailer was still on the level bridge, he could have coasted down the incline, but could not have reached a place where he could have gotten entirely off the paved portion of the roadway. As his truck and trailer would constitute a greater obstruction to traffic coming from the rear than to traffic coming from the other direction, he thought it best to remain on the bridge, where cars coming from the rear could see him for a greater distance. He put out three flares, of the kind commonly used to give warning on construction jobs; one near the front of the truck, one at the rear of the trailer, and one at the side about where the vehicles were coupled together. Several witnesses testified to having seen one or the other of these flares. On the other hand,

several witnesses testified that they saw no flares. But none of them was willing to assert that they were not there.

There is a conflict in the evidence as to how far the truck stood from the right-hand, or south, curb. Klimmer, the driver, said the truck and trailer were right up against the curb. Lund testified to the same effect. Ray, a disinterested witness who rushed over to the scene from Bunge's Service Station about five hundred feet beyond the incline, testified that it was "as close to the curb as one could get." Officer Rodius, who drove the police ambulance, testified that the truck and trailer were standing within a foot or eighteen inches of the south curb. However, Officer McDougal, who accompanied Rodius on the ambulance, testified that, according to his recollection, the truck was over from four to five feet from the curb. Even if that be true, since the truck and trailer were slightly less than eight feet in over-all width, this still left from twenty-three to twenty-four feet of unoccupied roadway; that is, a space from three to four feet wider than the paved surface of the majority of the hard-surfaced roads of this state, and five to six feet wider than the surfaced portion of our oiled roads.

After the truck stalled, the driver placed his flares and crawled underneath the truck with a blow torch to thaw out the fuel line. As he worked, cars passed in both directions. After he had been so occupied for ten or fifteen minutes, he heard a crash. As he stuck his head out from under the left side of the truck, a tire came whizzing by from in front, nearly striking him in the face. He found Lund's car fifteen or twenty feet out ahead of the truck and completely south of the yellow line. The other car had passed the truck and trailer and was near the north curb, the distance between the two automobiles being approximately one

hundred feet. Neither car had come into contact with the truck or the trailer.

Lund testified that he was on his way to Seattle. When he came around the curve on the bridge, he saw the truck and trailer about one thousand feet ahead of him, all lit up and standing right at the top of the incline. He knew they were standing because of the warning flares burning in the roadway. He slowed down and approached them at about fifteen miles per hour, and, seeing that there was plenty of room to pass, pulled to the left. Just as he got past the front of the truck, a car, coming up the incline at fifty or sixty miles an hour and astride the yellow line, collided with him. He testified that at no time did he go north of the yellow line in passing the truck and trailer. If the testimony of Klimmer, Ray, and Officer Rodius as to the position of the truck with reference to the south curb be accepted, as contrasted with the testimony of McDougal, there would have been no necessity for Lund to go north of the yellow line, because, in that case, there was a space between it and the truck and trailer of eight and one-half to ten feet.

If Lund's account of the collision is true, and the jury must have accepted the substance of it at least, for they returned no verdict against him, the driver of the other car must have been negligent in the extreme. What the jury thought about that, we have no means of knowing, since he was not a party to the action. It is necessary for us, however, to consider the matter in order to pass upon the appellant's contention that the standing truck and trailer was a condition and not a cause of the accident.

Reynolds, the driver of the west-bound car, testified that he did not know how many times he had been convicted of crime, but admitted three convictions when they were specifically called to his attention.

Having had one or two beers and a drink of whisky during the previous evening, at about eleven o'clock he took his guitar and a white girl friend and went out to the Wagon Wheel, a roadhouse a little west of the Seattle-Tacoma road, about nine miles out of Tacoma. Here, in a three-story building, an all-night party was in progress. The crowd, variously estimated at from one hundred fifty to two hundred, about half colored and about half white, were dancing and otherwise diverting themselves. The proprietor, who was called as a witness, stoutly maintained that he did not operate a bar and sold no liquor on the premises, but testified that he had five private rooms which people could rent and do what they pleased therein, and it was their business whether they drank liquor or not. All these rooms were in full blast. Reynolds did not take advantage of these accommodations, but confined his drinking strictly to lemonade.

Just before daylight, Reynolds was ready to start home. His girl friend sat with him in the front seat. Another colored man named Cravens was in the rear seat with a white girl named Vera; also the respondent and her fiance, a colored porter named Edmonson, who at one time had been a shipmate of Reynolds. The white girls were not called as witnesses. The respondent could give no account of the collision, as she was asleep before it happened and unconscious afterwards. Cravens was called, but shed no light on the matter, since he also was asleep when the collision occurred, and, when thus rudely awakened, immediately stepped out of the car and departed without lingering about for any purpose whatsoever.

Edmonson, although he had not slept for two days, was wide awake and saw the truck and trailer when they were over six blocks to a half a mile away. Ac-

cording to his testimony, Reynolds drove on the right side of the yellow line, but fairly close to it, until they came to the bridge, when he pulled over to the north curb. Lund's car whipped out from behind the truck, crossed the bridge, and ran into them when they were about opposite the cab of the truck. Reynolds said he had been driving about thirty-five miles per hour, just inside the yellow line. At a point, which scale maps show was about one thousand feet away, he saw the truck standing at the top of the incline. He slowed down to twenty-five miles an hour. He describes the accident as follows:

"Just as I went along by the truck I seen another car whip out from behind the truck. . . . He came right across the yellow line over to the right of the highway to his left and to my right."

On cross-examination, he testified as follows:

"Q. You were going along there at a very slow rate of speed, weren't you? A. Yes, sir. Q. You saw that big truck up there on the bridge, didn't you? A. Yes, sir. Q. You knew there might be other traffic going towards Seattle, didn't you? A. I left an ample amount of space for any car to pass. Q. Why didn't you get over next to the curb where you belonged instead of over next to the yellow line? A. I was over next to the curb; that is where my car was stopped, right up beside the curb."

Officer McDougal testified that there was a liquor sack, but no liquor, in Reynolds' car. Sergeant Brown and Officer Rodius both testified that there was a half-filled bottle of Crab Orchard in the back seat, and that Reynolds was under the influence of liquor. Brown further testified that Reynolds was still under the influence of liquor after having been treated at the hospital and taken to the police station.

If the jury had believed the testimony of Reynolds and Edmonson that Lund came clear across the bridge

and collided with them, they could not have exonerated him. Furthermore, Lund's version of the collision finds overwhelming support in the evidence. Ray, a disinterested witness, who was eleven hundred feet east of the accident, said that Reynolds passed him at sixty or seventy miles an hour and drove right up the middle of the incline and astride the yellow line without, apparently, slackening his speed. As he stood watching him, he heard the crash, and Reynolds' car was so far to the southerly side of the bridge that he at first supposed that he had hit the truck. Bunge, also a disinterested witness, who was near Ray, heard Ray exclaim: "Look at that car go." Bunge was not in a position to see it by that time, but could hear the whistling of the tires and testified that, from the sound, it must have been traveling more than sixty miles an hour.

Lund and Klimmer testified that the broken glass and the dirt knocked off the fenders of the cars showed that the collision took place after Lund had passed the truck. This was corroborated by Ray, Bunge, and Officers Brown, Rodius, and McDougal. All seven of these witnesses located the dirt and broken glass south of the yellow line and from fifteen to thirty feet ahead of the truck. Four of them said that it was apparent from the relative position of Lund's car and this debris that his car had actually been pushed back toward Tacoma by the collision. This tended to corroborate Lund's testimony that he was going slowly and that Reynolds was proceeding at high speed. All agreed that Reynolds' car traveled at least one hundred feet after the collision.

Four witnesses, Klimmer and the three police officers, testified that a plain skid or rubber mark extended from a point six to twenty feet ahead of the truck and ten to eighteen inches south of the yellow

line for a considerable distance south of that line, and then crossed it to the north and extended on to where Reynolds' car was standing. McDougal, who was called as a witness for the plaintiff and whose evidence on a number of points was more favorable to her than that of his brother officers, testified that the skid marks started a little east of the truck and from six to ten inches south of the yellow line, veered, still further on, to about eighteen inches south of it, and then crossed the yellow line and extended to where the Reynolds car stood one hundred feet away.

None of the evidence concerning these physical facts was contradicted or disputed in any way. The physical facts show beyond question that the collision occurred from twenty to thirty feet after Lund passed the truck and trailer, and that at least a foot of Reynold's car was south of the yellow line at the time of the collision, leaving fourteen feet of unused roadway to his right. They also tend to prove that Reynolds was driving at great speed.

We now pass to the question of the appellant's negligence. A Tacoma ordinance provides that:

"It shall be unlawful to park or leave standing any vehicle on any bridge in Tacoma. . . . Standing shall mean any vehicle at a standstill in the street with a competent person in charge."

 It was contended that, since the driver admitted that he could have coasted off the bridge proper, he was, therefore, guilty of negligence *per se.* Appellant, in answer to this contention, calls attention to a sentence from Rem. Rev. Stat., § 6397-9, reading: "Motor trucks must not coast down hill." But this sentence comes from § 9 of chapter 54, Laws of 1931, p. 179, and clearly relates only to motor trucks carrying explosives. Proof that a defendant was negligent *per se* does not of itself warrant a recovery, for, as is

recognized in our very recent decision in *Baldwin v. Washington Motor Coach Co.*, 196 Wash. 117, 82 P. (2d) 131, there may be facts excusing a technical violation of an ordinance. We will assume, for purposes of discussion, but without so deciding, that the appellant's excuse for the presence of the truck and trailer on the bridge was not sufficient as a matter of law, and that the jury was entitled to find that its driver violated the ordinance. But even so, the respondent was required to show that such violation was the proximate cause of her injury.

■ Was the evidence in this case of such a character as to warrant the trial court in submitting the question of proximate cause to the jury, or should it have been disposed of as a matter of law?

Usually, the question of proximate cause is for the jury. We so held in *Caylor v. B. C. Motor Transportation, Ltd.*, 191 Wash. 365, 71 P. (2d) 162. There, however, an auto bus blocked the highway so that but thirteen feet was left for cars to meet and pass. A drunken driver coming from the rear struck the bus and caromed off into an oncoming car, killing several people. It was held that the question as to whether the blocking of the road was a proximate cause of the collision was for the jury, particularly since the bus driver might have reasonably anticipated that, if he blocked the road, some such accident might happen. But it is recognized in the opinion that, when the facts are undisputed and the inferences therefrom plain and do not admit of reasonable doubt or difference of opinion, the question of proximate cause may become a question of law for the court.

In this case, the roadway was not blocked, but, taking the evidence most unfavorable to the appellant, at least a width of twenty-three or twenty-four feet was left free and open. There was no surprise involved.

The conditions were open and obvious, and were admittedly fully known to the drivers of the passing cars when each was at least one thousand feet away. Furthermore, in the *Caylor* case, the bus was an active factor in the matter, since it was because one of the cars struck it that it caromed into the other and injured its occupants. In this case, neither car even touched the truck or trailer. The undisputed physical facts show that the collision happened after the eastbound car had passed the obstruction and was south of the median line of the roadway. But, if these physical facts be entirely disregarded and it be assumed that the collision took place alongside the truck, it is certain that the driver of the truck had left an open road from three to four feet wider than the paved portion of our standard hard-surfaced roads, and from five to six feet wider than the oiled surface of our oiled roads. Could he have reasonably anticipated that other cars could not meet and pass each other in safety?

Where a defendant had parked a car contrary to an ordinance and opposite a pile of dirt on the other side of the street so that but sixteen feet of the street was left clear and a fire engine collided with the car and drove it up on the sidewalk where it struck the plaintiff and severely injured him, the court said, in *Falk v. Finkelman*, 268 Mass. 524, 168 N. E. 89:

"Upon the facts disclosed by the record it is obvious the defendant's violation of the ordinance was not an effective and contributing cause of the injury unless in accordance with the usual experience of mankind the result of that violation of law ought to have been foreseen and apprehended. One is bound to anticipate and provide against what usually happens and what is likely to happen, but is not bound in like manner to guard against what is unusual and unlikely to happen, or what, as is sometimes said, is only remotely and slightly probable. [Citing cases.] Tried by this test the defendant should not be held to have been negli-

gent in not anticipating that an alarm of fire in the vicinity would bring the fire apparatus upon Shirley avenue, and that in passing the defendant's car the driver of one engine would lose control of his engine, collide with another, and from the force of that impact be cast against the defendant's automobile with force to drive it up on the sidewalk and against any person or thing then thereon. The defendant violated no legal duty owed the plaintiff. The unlawful occupation of the street by the defendant's car was simply a condition and not a contributing cause of the accident. The defendant's motion for a directed verdict should have been allowed."

In the opinion in *McMillan v. Thompson,* 140 Cal. App. 437, 35 P. (2d) 419, a case decided in the district court of appeals, fourth district, but which the supreme court of California declined to review, there is an extended discussion of proximate cause in a case with facts somewhat similar to the case at bar. Due to engine trouble, a truck and trailer stalled on the right-hand portion of a paved, twenty-foot roadway. After seeing that his lights were burning, the driver attempted to make the necessary repairs. The driver of a Ford truck, approaching from the rear, seeing the stalled truck and trailer and that the left side of the highway was clear, turned to the left, and started to pass. When he reached a point opposite the rear of the trailer, another car, coming from behind, driven by one Deaver, crashed into the rear of the Ford truck and rammed it against the truck and trailer with such force that a passenger in the Ford truck was killed. In a wrongful death action, a recovery was had against both the driver and owner of the stalled truck and trailer. Upon appeal, the court held that they should have received a directed verdict, and ordered judgment entered in their favor. The court said, in part:

"The general rules applicable to such a situation

were outlined in *Newman v. Steuernagel,* 132 Cal. App. 417 [22 P. (2d) 780], as follows:

" 'It is the general rule that an original act of negligence is not a proximate cause of an injury when the same directly results from an intervening act of another party which was one not to be reasonably anticipated by the first party as reasonably likely to occur and follow through and from his own act. . . .

" 'In *Hale v. Pacific Tel. & Tel. Co.,* 42 Cal. App. 55, [183 Pac. 280, 281], the court said: "The rule, as we understand it, applicable to such cases, is that where the original negligence of a defendant is followed by an independent act of a third person which results in a direct injury to a plaintiff, the negligence of such defendant may, nevertheless, constitute the proximate cause thereof if, in the ordinary and natural course of events, the defendant should have known the intervening act was likely to happen; but if *the intervening act constituting the immediate cause of the injury* was one which it was not incumbent upon the defendant to have anticipated as reasonably likely to happen, then, since the chain of causation is broken, he owes no duty to the plaintiff to anticipate such further acts, and the original negligence cannot be said to be the proximate cause of the final injury." (Italics ours.)' . . .

"If it be assumed that the driver of the truck and trailer was negligent in stopping where he did, we think it must be held, under the established rules, that this act upon his part was not a proximate cause of the accident here in question. Had the truck and trailer been moving at the time, the appellants would not have been negligent, but the general situation, so far as the negligence of Deaver is concerned, would have been the same. The stalled truck was plainly visible, with its lights burning, and the left half of the highway was entirely clear, as testified to by the driver of the light truck which was about to pass. Under such conditions, while the driver of the stalled truck must have known that other vehicles would be apt to pass, it would be unreasonable to expect him to also anticipate that, while another car was passing, a third car would come up from behind and crash into the passing car. While a sudden stop frequently causes a collision with a car

approaching from the rear, it is not ordinarily to be expected that drivers of automobiles will run head-on into cars ahead of them which are in plain sight and have been long stopped. Much less is it to be expected that a driver will cross to the left half of a highway when the way is not clear, and then crash into a car ahead which is not stopped, but is moving in the same direction as himself. That the defendant Deaver should cross over to the left side of the road and then crash into a car directly in front of him is a circumstance hardly to have been expected whether the truck and trailer were stopped or moving. In our opinion, the injury here resulted, not only from the intervening act of a third party, but from one which was not reasonably to have been anticipated by the driver of the stalled truck as likely to occur and follow through and as the result of his own act."

See, also, 43 C. J. 931; 22 R. C. L. 134; *Ross v. Smith & Bloxom,* 107 Wash. 493, 182 Pac. 582; *Katz v. Helbing,* 205 Cal. 629, 271 Pac. 1062, 62 A. L. R. 825; *Powers v. Standard Oil Co.,* 98 N. J. L. 730, 119 Atl. 273; *Mounts v. Tzugares,* 9 Cal. App. (2d) 327, 49 P. (2d) 883; *Kukacka v. Rock,* 154 Ore. 542, 61 P. (2d) 297; *Leveillee v. Wright,* 15 N. E. (2d) (Mass.) 247.

A recent decision of the supreme court of Minnesota, *Geisen v. Luce,* 185 Minn. 479, 242 N. W. 8, is, perhaps, more apposite than that of *McMillan v. Thompson, supra.* One Ferris was driving a Cadillac car and it became disabled and came to a standstill on its proper side of the road, but in such a position as to violate the following statute:

" ' . . . provided, in no event shall any person leave standing any vehicle, upon any highway unless a clear and unobstructed width of not less than fifteen feet upon the main traveled portion of said highway opposite such standing vehicle shall be left for free passage of other vehicles thereon, . . .' "

Luce, with the plaintiff as a passenger, came up from behind the Cadillac, traveling at fifty-five to sixty miles

per hour. When the front of the Luce car was opposite the rear wheel of the Cadillac, Luce discovered a car about seventy-five feet ahead, coming from the opposite direction at not less than fifty miles per hour. Finding himself so confronted, Luce turned to the left on the shoulder of the road and his car went into the ditch and turned over, injuring the passenger. The plaintiff, Luce's passenger, sued both Luce and Ferris, and recovered a verdict against both. On appeal, the judgment against Luce was affirmed, but the lower court was instructed to enter judgment in favor of Ferris notwithstanding the verdict. While the court held that the violation of the statute was excusable, since the Ferris car was disabled, it went on to say:

'There is another reason why the plaintiff cannot recover; and in the consideration of this question we will assume, contrary to what we have just held, that it was reasonably practicable for Mr. Ferris to have moved his car so as to provide the required 15 feet. The only charge of negligence against Ferris is that he permitted his car to stand on the pavement in violation of the statute. It is conceded that if he had been, at the time and place, driving his car slowly he would not have been guilty of negligence. Under the circumstances this accident would have happened just the same had the Ferris car been moving slowly. Indeed, had the Ferris car been moving it might have made the situation more dangerous. If the Ferris car while standing bore any relation to the accident, it was solely because of its being on the highway, not because it was a standing rather than a moving car. Its presence was known to all; it created no surprise; it did not obstruct a view of the traffic.

"It seems apparent that even if the standing had been such as to be a violation of the statute, it would not under such circumstances as here involved be the responsible cause, because the accident would not have occurred had it not been for Luce's negligence which was an intervening responsible cause, it not being a consequence of the 'standing.' In other words, upon

the facts most favorably stated for plaintiff, there was no causal connection between the 'standing' of the Ferris car and the accident; and without such causal connection there can be no recovery.

" . . . Even though the standing of a car on the highway may be unlawful, yet the wrongful standing cannot be the proximate cause of an accident unless it results from the standing. While such standing may be the occasion or condition, it is not in a legal sense a contributing proximate cause of the accident. [Citing cases.] The 'standing' of the Ferris car did not set Luce's negligence in operation nor concur therein. This accident resulted from Luce's excessive speed, his indiscretion in not having his car under control in anticipation of south-bound traffic, and his failure to appreciate the impending danger. This conduct on his part constituted negligence, which was the proximate cause of the accident."

Since Reynolds was not a party to this action, the jury had no opportunity to directly pass upon the question of his negligence. But it exonerated Lund, and, if two meeting automobiles fail to safely pass each other on an unobstructed pavement, at least twenty-three or twenty-four feet in width, one or the other must be negligently driven.. If this is not so, thousands of miles of our twenty and eighteen foot roads are dangerously unsafe.

"Ordinarily proximate cause is a question of fact for the jury. It is so when different reasonable inferences might be drawn from the evidence. However, if the only reasonable deduction that can be made from the evidence is that the injuries sustained are not the natural and probable consequences of the negligence charged, it becomes a matter of law for the court to declare." *Kukacka v. Rock,* 154 Ore. 542, 61 P. (2d) 297.

In our opinion, there is no substantial evidence in the record tending to prove that the standing truck and trailer played any real part in the collision. Reynolds saw the truck and trailer when a thousand feet

away. So far from inviting him to drive in the middle or on the south side of the roadway, they actually warned him to slow down and pass a sufficient distance to the right as to leave ample room for other traffic. Had he exercised the most ordinary care, there would have been no collision. The presence of the truck and trailer on the south part of the bridge was a condition and not in any legal sense a contributing proximate cause.

The judgment appealed from is reversed, and the cause dismissed.

STEINERT, C. J., MAIN, BEALS, GERAGHTY, and SIMPSON, JJ., concur.

BLAKE, J. (dissenting)—I dissent. In holding that appellant's negligence was not the proximate cause of the collision, I think the court has invaded the province of the jury. Furthermore, in arriving at that holding, it seems to me that the majority have, by implication at least, imputed to respondent the negligence of the driver of the car in which she was a passenger.

MILLARD, J. (dissenting)—I concur in the view expressed by Blake, J., that, by the majority opinion, this court has invaded the province of the jury.

We held in *Burson v. Blackwell*, 184 Wash. 669, 52 P. (2d) 351, that a verdict is conclusive as to questions of fact properly submitted to the jury, and in reviewing a verdict our inquiry is limited to whether there was substantial evidence to take the case to the jury. See, also, 2 R. C. L. 193, 194.

If verdict is based on conflicting evidence, that of the prevailing party must be taken as true, as well as all reasonable inferences deducible from such evidence. *Edwards v. Seattle etc. R. Co.*, 62 Wash. 77, 113 Pac. 563.

"On a challenge to the sufficiency of the evidence to support the verdict, the question presented on appeal is, admitting the truth of all the evidence of the plaintiff, together with such inferences and conclusions as may reasonably be drawn therefrom, and eliminating all evidence of defendant in conflict with plaintiff's evidence, and all opposing inferences, whether there is any competent evidence tending to support the verdict against the defendant." 3 Am. Jur. 444, § 887.

In other words, the rule to which we are committed is that we will, in determining the sufficiency of the evidence, assume as true that version of the evidence which supports the verdict.

We must, to reverse the judgment—but how can we, on the record before us—say that there is neither evidence nor reasonable inference from the evidence to justify the verdict.

"All competent evidence in the record which is favorable to the respondents we must regard as true and must give them the benefit of every favorable inference which may reasonably be drawn from such evidence. Where the minds of reasonable men may differ, the question should be submitted to the jury. If, when so considered, we find there is substantial evidence to sustain the verdict, the judgment must be affirmed. *Hart v. Hogan,* 173 Wash. 598, 24 P. (2d) 99; *Boyd v. Cole,* 189 Wash. 81, 63 P. (2d) 931; *Vercruysse v. Cascade Laundry Co.,* 193 Wash. 184, 74 P. (2d) 920; *Perren v. Press,* 196 Wash. 14, 81 P. (2d) 867." *Gibson v. Spokane United Railways, ante* p. 58, 84 P. (2d) 349.

There was evidence on behalf of respondent to the effect that appellant's truck was parked four to five feet from the curb with headlights burning and no flares or other signals displayed to warn travelers on the highway that appellant's truck was stalled or parked. There is testimony that the truck obstructed the view of the driver approaching from the east so

that he could not see the traffic proceeding from the west. While so parked, the driver of the truck testified, the truck could easily have been operated down the incline and off the bridge to a point where the truck would have been entirely off the highway. Reynolds approached the bridge from the east. Lund approached the bridge from the west.

In arriving at a point close to the place where the truck and trailer were parked (whether the truck was stalled by reason of a frozen feed pipe, was a question of fact), Lund turned to the left of the truck to pass it; and while so doing, his attention was, in part, on the truck, because of his apprehension that some person might come out from under the truck or on the side of the truck, and, as he glanced from the truck and looked ahead, he saw the car operated by Reynolds almost on him. The collision between the two cars resulted. The evidence whether the collision occurred opposite the truck or in front of the truck is in sharp conflict. There was testimony from which the jury could reasonably have inferred that the driver of the truck was by the side of his vehicle, and that, to avoid striking him, Reynolds veered toward the side of the highway away from the truck.

We have consistently held that it was a question of fact for the determination of the jury whether the parking of a vehicle under such circumstances was warranted. The jury's verdict establishes the fact there was no excuse for parking on the bridge. That is, whether appellant exercised the required degree of care in parking his truck on the bridge, was a question for the determination of the jury. I am in accord with the rule enunciated in *Kukacka v. Rock*, 154 Ore. 542, 61 P. (2d) 297, mistakenly cited to sustain the majority opinion. The majority holding that the only reasonable deduction that can be made from the

evidence is that the injuries sustained are not the natural and probable consequences of the negligence charged, is an invasion of the province of the jury.

The judgment should be affirmed.

HOLCOMB, J., concurs with MILLARD, J.