[No. 27182. Department One. April 4, 1939.]

B. H. CROWLEY, *Respondent*, v. THE CITY OF RAYMOND, *Appellant*, NOEL GUEDON *et al.*, *Defendants*.[1]

[1]Reported in 88 P. (2d) 858.

*Welsh & Welsh,* for appellant.

*Fred M. Bond* and *Roy W. Seagraves,* for respondent.

*A. C. Van Soelen, John A. Logan, George M. Ferris, Howard Carothers, Hobart S. Dawson, John A. Homer, Harry L. Olson,* and *Lester T. Parker, amici curiae.*

ROBINSON, J.—In the early afternoon of Sunday, January 31, 1937, Noel Guedon, driving an automobile, turned into Duryea street, in the city of Raymond, at the 4th street intersection, and drove along Duryea toward the east. According to his own testimony, while driving at a speed of ten to fifteen miles per hour, he came to the 8th street intersection and suddenly saw before him, in the middle of the street, an object which he called a "barricade." There was room to pass between the so-called "barricade" and the curb, so he slowed down and pulled over to the right with that purpose in mind. Unfortunately, his car skidded, jumped the curb, ran up on the sidewalk, struck Mrs. B. H. Crowley, a pedestrian thereon, and broke her leg. There is no evidence that the car came in contact with the object in the street.

Mrs. Crowley filed a claim against the city, which the city rejected, and she thereupon brought this action against Guedon and wife and the city of Raymond. The Guedons defaulted, and Mr. Guedon appeared at the trial only as a witness for the plaintiff. Mrs. Crowley recovered a verdict against all defendants, and, from the judgment entered thereon, the city alone appeals.

At 8th street, and to the west of 8th, Duryea is practically level. Going easterly, it remains so until about the westerly line of the 10th street intersection. Here,

it rises sharply in a grade of twelve or thirteen per cent, and so continues to 11th.

That Sunday morning, the street was covered with snow and ice, and about twenty-five children were coasting on the hill. Their sleds acquired sufficient momentum to cross 9th and run to somewhere near the middle of the block east of 8th. There was coasting also on Commercial street, a street south of Duryea and parallel thereto, although not so much as on Duryea street, since the hill on Commercial was not so steep. Duryea street is the main east and west artery of the city. Some persons, not identified in the record, called the attention of the chief of police to the dangers involved, and he went to the scene and investigated the matter. After looking over the situation, he detailed some of the larger and more responsible boys to watch and warn traffic until he could procure two signs belonging to the city. By his orders, one was placed in the street at the 8th street intersection, and one at the 11th.

It is one of these signs that Guedon referred to as a "barricade," a misleading term, since it connotes not only a somewhat solid and substantial structure, but one completely closing a passageway. The object which Guedon so suddenly discovered was really nothing more than a stop sign, although an unusually long one, being half the width of the thirty-six foot street. It was set in the middle of the street, leaving a space of nine feet on each side between it and the curb.

These signs were exactly alike, and one of them has been brought here as an exhibit. Its main member is an eighteen foot board, nine inches wide by a scant seven-eighths of an inch in thickness. The board is painted white, with the word "STOP," in heavy six-inch letters, about three or four feet from each end. Between these words and outside of them, there

are alternate white and black strips, three inches in width, running up and down at a slight angle, giving a kind of zebra effect which is quite striking and at once challenges notice and attention. The board is supported by two 2x4's at each end thereof about four feet in height, set like the arms of the letter "A", the board being inserted in the apex. These 2x4's are set at such an angle that their feet are but twenty inches apart on the ground. In its present dried-out condition, the entire contrivance cannot possibly weigh more than twenty-five pounds, though doubtless it weighed more when exposed to wet weather. But even then, due to its flimsy construction and narrow base, it could have been overturned by a relatively slight push.

There is a great deal of conflict as to whether or not there was a red flag hanging from the middle of the sign. The man who placed the sign there testified that there was. A number of witnesses testified that they saw none. The matter is of slight consequence. Without any flag, the sign could be plainly seen for many blocks, and Guedon, assuming that he had normal vision, must have seen it, if he looked, the moment he came into Duryea street at 4th.

The plaintiff appears to have proceeded upon the theory that the sign constituted a negligent obstruction in the street and a nuisance of which the city had actual or constructive notice. Assuming that the city had actual notice of the condition created by the chief of police, it is rather difficult to see how it could have anticipated that it would constitute a danger to anyone, especially to anyone using the sidewalk. A driver coming from the east had nine feet of clear roadway next to his right-hand curb, as Guedon himself had coming from the west; that is, drivers coming from either direction had fully as much space as they would have had on any eighteen foot roadway of the state.

Would any reasonable person have anticipated that the mere presence of the sign in the middle of the road would cause a driver to run over the curb and injure someone on the sidewalk? Assuming that the city was negligent, are we not here dealing with an intervening act of negligence?

■ It is a general rule that an original act of negligence is not a proximate cause of an injury where the same directly results from an intervening act of another party which was not to be reasonably anticipated by the first party as reasonably likely to occur and follow through from his own act. *Bracy v. Lund,* 197 Wash. 188, 84 P. (2d) 670, and cases therein cited.

■ It is unnecessary, however, to decide the question raised in the last paragraph, for the rule—whatever one may think of its wisdom and justice—is firmly established in this state, and in practically all of the states, that municipalities are not liable for the negligence of their officers and employees when engaged in the performance of governmental or public duties. The rule itself, the reasons upon which it is based, the decisions of other states applying it, and a detailed review of our own previous decisions relating to it, are set out in the comprehensive and exhaustive opinion in the case of *Hagerman v. Seattle,* 189 Wash. 694, 66 P. (2d) 1152, 110 A. L. R. 1110, an *En Banc* decision handed down in April, 1937.

As is pointed out in that opinion, it is often difficult to apply the rule to the particular facts, but we think that the instant case presents no such difficulty. Clearly, in placing the signs in Duryea street, the chief of police of the city of Raymond was not in any way constructing, repairing, or making any physical change in the street itself. He was merely temporarily regulating traffic in the interest of public safety. Had he stationed patrolmen at the intersections to direct traffic,

no one would dispute that he was performing a governmental function. The fact that he used signs instead of patrolmen does not alter the nature of his act. Even if it were found that he was negligent in placing the signs in the street and that he placed them in the street with the knowledge of the city officials, the plaintiff could not recover against the city. 13 R. C. L. 224, § 189; *Martin v. Canton,* 41 Ohio App. 420, 180 N. E. 78; *Dorminey v. Montgomery,* 232 Ala. 47, 166 So. 689; *Mingo Junction v. Sheline,* 130 Ohio St. 34, 196 N. E. 897.

The respondent contends, however, that the instant case is not governed by the rule which we have just discussed. The argument is that it is the absolute duty of the city to keep its streets free from obstructions, and that the placing of the signs in the street constituted an obstruction and a nuisance. Respondent's attorney stoutly contended at the trial that the purpose of the city in placing the signs could not even be shown in evidence, contending that the duty of the city to keep the street free from obstructions was so absolute that its purpose in placing the signs was wholly irrelevant and immaterial. That theory would make it unlawful for a city to erect protective signs and barriers in a street while a ditch was being dug across it for the purpose of installing a sewer or a water main. This, clearly, is not the law. In this case, the purpose is not only material, but controlling, since it qualifies and gives character to the act.

The placing of the signs in the street for the purpose of protecting the children at play did not create a nuisance. In *Gerritsen v. Seattle,* 164 Wash. 459, 2 P. (2d) 1092, it appeared that the city of Seattle had authorized the Seattle school district to stretch a chain across a public street to protect school children during play periods. A motorcyclist ran into the chain and

was injured. In an action against the city and the school district, it was argued that the city had authorized the district to create a nuisance in the street. The court, in answer to the argument, said:

"It seems to us that the public purpose for which the street was authorized to be temporarily closed during the play periods and the manifest public convenience and benefit thereby served, call for the conclusion as a matter of law that the city did not authorize the creation of a nuisance in the street by the district."

The nuisance theory was squarely rejected by the supreme court of Ohio in *Mingo Junction v. Sheline, supra,* a case quite in point, since it involved the erection of barriers to protect children while coasting. It appears that § 3714 of the Ohio General Code provides that city councils shall have the care, supervision, and control of public highways and streets, "and shall cause them to be kept open, in repair, and free from nuisance." The court said, in part:

"Some doubt exists as to whether counsel for defendant in error, in the trial of the case, relied upon that section for recovery or upon his claim that the city was exercising a proprietary duty. But, giving such counsel the benefit of the doubt, and permitting him to rely upon his claim of liability because of the city's failure to keep the streets free from nuisance, the legal question is presented whether the setting aside of a street for coasting purposes and the erection of barriers thereon is a nuisance within the purview of that section."

The court held, first, that the setting off of a street for coasting by erecting barriers was an act done in a governmental capacity, and second, that the erection of the obstructive barriers did not constitute a nuisance:

"The construction of the modern safety zones in a city street creates a dangerous condition, and, as is well known, occasions many accidents. They may be

classed as nuisances in a popular sense, but not so in a legal sense within the purview of Section 3714, General Code."

And so, here, assuming on behalf of the respondent that the officers of the city of Raymond acquired notice, during the four or five hours the signs remained in the street, of what the chief of police had done in the premises, or even assuming that they specifically directed him to do what he did, the city cannot be said to have authorized, created, or maintained a nuisance. 13 R. C. L. 224, § 189; *Simon v. Atlanta*, 67 Ga. 618, 44 Am. Rep. 739; *District of Columbia v. Manning*, 18 F. (2d) 806, 53 A. L. R. 167; *Lawrenceburg v. Lay*, 149 Ky. 490, 149 S. W. 862, Ann. Cas. 1914A, 1194, 42 L. R. A. (N. S.) 480; *Owens v. Atkins*, 163 Ark. 82, 259 S. W. 396, 34 A. L. R. 267.

The judgment appealed from, in so far as it awards a recovery against the city of Raymond, is reversed, and the action as against the city is ordered dismissed.

BLAKE, C. J., MAIN, STEINERT, and MILLARD, JJ., concur.