[No. 31256. Department Two. December 21, 1950.]

DAN R. MITCHELL *et al.*, *Respondents*, v. JOHN ROGERS *et al.*, *Defendants*, ORVILLE PRESTON *et al.*, *Appellants.*[1]

[1] Reported in 225 P. (2d) 1074.

*Brethorst, Holman, Fowler & Dewar* and *A. T. Bateman,* for appellants.

*Horrigan & Leavy* and *Orville B. Olson,* for respondents.

ROBINSON, J.—This is an action to recover damages for personal injuries arising out of an automobile accident.

The evidence in the case is much in conflict, but, in general, what seems to have occurred was this: On July 22, 1947, appellant Preston, accompanied by a hitchhiker, Milton Tate, was driving a truck, owned by appellants Heimbigner, from Oregon to Sprague, Washington. It was the middle of the afternoon of a bright, sunny day. The truck was of the flat-bed type, about seven feet ten inches wide at its widest point, and was loaded with a five and one-half-

ton tractor. At a point about two and one-half miles south of Pasco, Preston heard what he described as a "sizzling noise" and discovered that he had a flat tire. He pulled the truck part way onto the shoulder of the road and attempted to change the tire, but found that he was unable to do so with the equipment he had available. He decided to go into town to get more tools.

Whether Preston's truck was disabled to such a degree that it was impossible for him to avoid stopping where he did, is a matter of some dispute. We will assume, however, that it was. The width of the road and shoulder was also disputed, but Preston, who later measured them, testified that the pavement was twenty feet wide, while the shoulder was about four feet wide. He stated that he parked the truck as far over on the shoulder as he could without coming dangerously close to an adjacent ditch. According to his testimony, this left five and one-half to six feet of pavement between the yellow line in the center of the highway and the truck. Tate also testified that, as parked, the truck was from five to six feet from the center of the highway, but the value of his testimony on this point is debatable, since, in contrast to all of the other witnesses, he testified that there was no center line on the road. Defendant Rogers, who, however, admittedly did not get a good look at the situation, thought that the truck was stopped two and one-half to three feet from the center line. The quality of the evidence on this point, and the dispute concerning it, is unfortunately fairly typical of most of the testimony relating to measurements and distances which was presented in the case.

The truck was stopped in the middle of a long, straight stretch of road, running from the direction of the Snake river bridge, about a mile and a half northward towards Pasco. At the end of this stretch, the road curved. The truck was parked, facing north, at a distance of from a quarter to a half mile from the curve. There was testimony that, from either end of this section of the road, it was possible to see cars traveling as far as the other end, although there

was some indication that, at the point of the accident, a slight rise, followed, to the south, by a dip, partially or momentarily obscured the vision of drivers coming from the direction of Pasco. This was controverted.

Preston's truck was normally equipped with warning flags, but, although the testimony is somewhat vague on the point, it appears that the box in which they were contained had been removed in order to make room for the tractor. In any event, he put up no such flags before departing to town. His version of the conversation he had at this time with the hitchhiker, Tate, and Tate's version, differed. He stated, speaking of Tate:

"Q. Did you give him any instructions when you left the truck? A. I told him to go back to the rear end and signal traffic. Q. Then what did you do? A. I got a ride into Pasco and went to the station and got a service station man and tools and went back there to change the tire."

Tate testified, on cross-examination:

"Q. Now, then, at that time you say you had a conversation with Mr. Preston about staying at the truck? A. We just looked at each other and I suppose he didn't figure me, being a hitchhiker would come back, so he told me to look after things and he would go to get the wrench. Q. He told you to look after the truck? A. He didn't give me any instructions, only I suppose to see no one stole anything. Q. But you understood from that you were to look after the truck? A. *I was looking after the truck and then I noticed the traffic was coming so fast and with that mean corner so I thought I had better look after traffic meeting right there at the truck.*" (Italics ours.)

In any case, it appears from Tate's testimony that, at the time of the accident, he was signaling traffic approaching from the rear of the truck, that is, from the south, or the direction of the Snake river bridge, with two white boards, about twenty inches in length, which were part of a broken sign.

Preston testified that he made only one trip to town, and that the accident which gave rise to this case occurred while he was gone; Tate said that he made three trips before he obtained adequate tools, and that the accident took place

while he was away on the third. Whatever the truth of the matter, it is clear that Preston was not present at the accident, which developed in the following manner:

Respondent Dan Mitchell, accompanied by his mother, Mrs. Alice Mitchell, was driving his automobile from Pasco south on his way to his home in California. He testified that he was traveling about forty or forty-five miles per hour. When he rounded the curve ahead of where the truck was parked, he saw it immediately, facing in his direction in the opposite lane; but he testified that he did not know whether it was stopped or moving, and that he was unable to tell at that distance that it was partially off the road. Shortly thereafter, he testified that he reached the dip in the road and, for a moment, could only see the cab of the truck. Just after the truck came into full view again, an automobile, coming in the other direction, passed it. Mitchell testified that he let up on the accelerator in order to allow this automobile time to get into its own lane and pass him safely. When it had done so, he put his foot on the accelerator again and passed the truck at a speed he estimated at about thirty to thirty-five miles an hour. This estimate of his speed was corroborated by Tate.

He testified that, from about the time the car passed him, he realized that the truck was stopped. He saw no other car approaching in the other direction until he was about two or three times times the length of the truck away from it. Then he saw a car coming from behind the truck. As he watched, it slowed down, "evidently preparing to stop." Upon passing the truck, he noticed that this car was the second of two vehicles which had stopped behind it. When he was, in his words, "a little ways" beyond this second vehicle, another car, coming in the same direction as the truck, suddenly swung, according to his testimony, into his lane. He testified that, prior to that time, he had been unable to see this car because, at least until he was almost upon it, the truck and the two vehicles behind it had blocked his view. Although it is undisputed that he was already traveling to the right of the center line of the high-

way, he and his mother both testified that he swung over still further towards his own side. He was unable to avoid a collision, however, and the left front portions of both automobiles struck each other. Mrs. Mitchell was thrown from the car, which traveled some distance down the road and then swerved off of it. She and her son, who was the more severely injured of the two, were taken to a hospital in Pasco.

The car which the Mitchell vehicle struck was being driven by defendant Rogers, who was going north toward Pasco, at a speed which he testified was around thirty-five or forty miles per hour, but which Tate stated was greater than that of the Mitchell car. Rogers testified that, when he first saw the truck in front of him, he thought it was moving, but realized that it was not when the driver of the first of the two vehicles between him and the truck, which he described as a pick-up, "put on the brakes sudden-like," and the driver of the second car, a sedan, immediately did likewise. Rogers tried to put on his own brakes, but, being unable to stop in time, decided to attempt to pass between the parked automobiles and the Mitchell car, which he observed approaching in the other lane. He denied crossing onto Mitchell's side of the road, but admitted that his car was over the yellow line after the impact, and testified that he did not believe that Mitchell's car was ever on the wrong side.

Tate, who, according to his testimony, was standing at the rear of the truck, stated that he saw the Mitchell car coming, and, in consequence, gave the pick-up the "switchman's stop signal" with his two pieces of board. He testified that the pick-up did not use its brake, but "just coasted in slow." Tate did not recall any car between the pick-up and the Rogers car, but he testified that he saw the top of the Rogers car behind the pick-up, and tried to signal its driver by jumping up on a bank. But the Rogers car remained behind the pick-up, and he was unable to signal it or to prevent the collision.

Mitchell and his mother brought this action jointly against the marital community of John Rogers and wife,

and against Preston and the marital community of Leonard Heimbigner and wife. Mitchell claimed damages in the sum of $28,729, and his mother, in the sum of $7,090.05, $90.05 of this amount being claimed as special damages for medical attention. During the course of the trial, the jury viewed the scene of the accident. In its verdict, the jury absolved Rogers from liability, but found in favor of the plaintiffs as against defendants Preston and Heimbigner, awarding damages to Mitchell in the sum of $3,729.00, and to his mother, in the sum of $90.50. The court entered judgment accordingly, and, in due course, denied the motion of defendants Preston and Heimbigner for judgment notwithstanding the verdict, or, in the alternative, for a new trial. From the judgment against them and from the denial of their motion, these defendants have appealed.

■ At the outset, respondents have interposed a motion to strike appellants' brief. The first ground of this motion is that appellants have taken four pages to state the questions raised by their appeal, although Rule 16, subsection 4, of the present Rules of the Supreme Court, provides that:

"The questions and answers in their entirety should not ordinarily exceed one page and must never exceed two pages." 18 Wn. (2d) 18-a.

Noncompliance with this rule will not, however, justify the granting of the relief prayed for by respondents. What we said in *Trowbridge v. Clark*, 36 Wn. (2d) 750, 219 P. (2d) 980 (not yet handed down at the time of writing of appellants' brief), disposes of the matter and need not be repeated here.

■ The second ground of respondents' motion is that appellants' brief allegedly sets forth, as facts, statements which are completely unsupported by the testimony. Appellants' statement of facts is undoubtedly predicated upon the testimony most favorable to them. This is particularly unfortunate in an appeal from the denial of a motion for judgment notwithstanding the verdict, since this court is

unable to say that the trial court erred in denying such a motion unless it appears as a matter of law that the record contains neither evidence nor reasonable inference from the evidence sufficient to justify the verdict. *Reynolds v. Morgan*, 134 Wash. 358, 235 Pac. 800; *Hart v. Hogan*, 173 Wash. 598, 24 P. (2d) 99. Yet any such error that appellants may have made in the present case is scarcely so flagrant or so exceptional as to warrant striking their briefs or dismissing their appeal. The motion is accordingly denied.

■ We turn now to the merits. Assuming, as appellants vehemently contend, that Preston's truck was disabled at the time of the accident, there can be no question but that he violated the express terms of Rem. Supp. 1947, § 6360-32aB (3), which, with reference to vehicles such as the one involved here, provides as follows:

"Whenever any vehicle of a type referred to in this section is disabled upon the traveled portion of a highway or the shoulder thereof, outside of any municipality at any time when the display of fuses, flares, or electric lanterns is not required, the driver of such vehicle shall display two red flags upon the roadway in the lane of traffic occupied by the disabled vehicle, one at a distance of approximately one hundred (100) feet in advance of the vehicle, and one at a distance of approximately one hundred (100) feet to the rear of the vehicle."

But appellants contend that, regardless of Preston's negligence in this respect, such negligence could not have been the proximate cause of the accident. They contend further that the evidence conclusively establishes that respondent Mitchell was guilty of contributory negligence as a matter of law; and finally, they assert that the court erred in giving certain instructions, and in refusing to give certain others.

Appellants' argument that Preston's failure to place warning flags could not have been the proximate cause of the accident, is grounded upon their assumptions as to the physical circumstances under which it took place. They assert that the truck was clearly visible for a long distance in either direction, that there was plenty of room for the

Rogers and Mitchell cars to pass each other even with the truck on the pavement, and, most strenuously, that the accident actually took place, not adjacent to the truck, or even close behind it, but from one hundred fifty to two hundred feet down the road from it. They state, in their brief:

"It is obvious that the sole purpose of requiring the placing of red flags is to give warning of the presence of the vehicle upon the highway. If the drivers of the other automobiles involved are aware of the presence of the stopped vehicle on the highway, other warning of that fact is unnecessary, and the failure to display the warning flags could have nothing to do with the accident. . . .

". . . the appellant Preston was not obliged to anticipate that in broad daylight, in open country, on a straight substantially level highway two automobiles approaching in the opposite direction, with a clear view of one another for more than ½ mile, would succeed in colliding with one another at a point not even within the area of the highway obstructed by the truck."

Unfortunately for appellants, the statute is mandatory, and does not relieve the operator of a stalled truck from the duty of placing warning flags beside his disabled vehicle, though he may feel that no serious danger is presented; and even if this were not so, the evidence does not support appellants' frequently reiterated conclusion that the situation was not of such a hazardous character that Preston should have supposed that warning flags would be necessary.

Preston stated that he instructed Tate to signal oncoming traffic. Tate testified that he "noticed the traffic was coming so fast and with that mean corner so I thought I had better look after traffic meeting right there at the truck." Both appear to have realized that, parked where it was, the truck presented a danger to traffic. It is futile to state that Preston was not obliged to anticipate an accident, for, by his own testimony, he did anticipate it. But the precautions he took to avoid it were not those required by statute, nor were they adequate to deal with the situation. Even if he instructed Tate to signal oncoming ve-

hicles, Tate, signaling with his pieces of board at cars approaching from the rear, was obviously no adequate substitute for warning flags properly placed one hundred feet to the front and to the rear of the standing truck. Mitchell testified that he was unable to see Tate at all until he had passed the truck; and it is apparent, from the testimony of both Tate and Rogers, that because of the intervening pick-up truck, Tate's signals, given, as they were, from a point immediately behind the truck, were of no use whatever to Rogers.

Appellants assert, however, that the evidence shows that both Mitchell and Rogers saw the parked truck for a long distance before they arrived in its vicinity, and they urge that their failure to take note of it and act accordingly operated as a superseding cause of the accident; for they argue that the actual notice of the presence of the truck on the highway served every purpose that could have been served by the warning flags. In his memorandum decision denying the motion for judgment notwithstanding the verdict, the trial judge observed of this contention as follows:

"The jury might well have found from the evidence that the failure to put out red flags front and rear as provided by the statute, was the sole and proximate cause of the accident, for the reason that the red flags would have indicated to those approaching the truck that it was stopped. Both drivers Mitchell and Rogers testified that they thought the truck was moving when they first saw it. Had the red flags been put out where they were supposed to be, the operators of the cars could have plainly seen that the truck was not in motion."

This circumstance is alone sufficient to distinguish the present case from *Bracy v. Lund*, 197 Wash. 188, 84 P. (2d) 670. There, the driver of a truck and trailer, stalled on a bridge, put out warning flares at the front, rear, and side of the vehicles. At least twenty-three feet of space was left for other traffic to pass. Defendant, Lund, driving his automobile, approached the truck from the rear, and, seeing the flare, regulated his actions accordingly, attempting to pass the truck at a reduced speed of fifteen miles per hour. Had it not been for the negligence of the driver of

the plaintiff's automobile, which approached from the other direction, as the Mitchell car did in the case at bar, but, according to the preponderance of the evidence, astride the yellow line and at a probable speed of sixty miles an hour, no accident would have occurred. Because Lund saw the flare which had been placed to the rear of the stalled truck and trailer; because, as the evidence demonstrated, the driver of the plaintiff's car should have seen the flare placed in front of him (since he saw the truck and trailer when a thousand feet away); and because there was twenty-three feet of roadway in which both automobiles, if properly driven, could have safely passed the truck and trailer, we held that the parking of these vehicles on the bridge, even if unlawful, could not have been, in any legal sense, a contributing proximate cause of the accident, but was only a condition thereof.

In the present case, however, the appellant, though he had parked his truck in such a manner that, according to the testimony of both Mitchell and Rogers, it was impossible for an approaching driver to tell it was not moving until he came quite close, made no effort to mitigate this hazard, except, according to his own testimony, to tell the hitchhiker accompanying him to "signal oncoming traffic." It was at least possible that, had warning flags been placed as required by statute, Mitchell would have approached the truck with greater caution. It is even more likely that the two vehicles preceding Rogers would not have been forced to stop so suddenly, enabling Rogers to have stopped also without having felt it necessary to attempt to pass them. And, perhaps most significantly, Rogers himself might well have seen the flags in time to slow down safely. Thus, under the testimony, it is plain that the jury could have concluded that, had warning flags been properly placed, the actions of any of the drivers involved would have been altered sufficiently to have prevented the accident.

But appellants urgently contend that the collision occurred so far down the road from where the truck was

parked that the presence of the truck, even without warning flags, could not have caused it; and they argue that the actual, proximate cause thereof was the failure of both Rogers and Mitchell to exercise the most ordinary care in taking note of the situation around them. However, appellants' argument in this connection is based on a misapprehension of the evidence. They state in their brief (and the thought is expressed on more than one occasion):

"Also, and judicially compelling of a reversal of the judgment of the trial court is the established and uncontradicted fact that the accident here occurred at a point 150 to 200 feet behind the appellants' truck where the entire 20 feet of the paved roadway, plus the additional width of the shoulders, was clear."

This statement is not borne out by the record. It is true that appellant Preston, who was not present at the accident, testified that the Rogers car, after the impact, was about two hundred feet behind the truck. Estimating his step as about three feet in length, he further testified that it took him seventy steps to measure the distance between the truck and the glass and debris which the accident presumably left on the pavement. But the testimony of Mitchell and Rogers as to the distance between the truck and the point of the accident was most inconclusive, and, when it is considered as a whole, it is apparent that they were not at all sure what the true distance was. The following excerpt, taken from the cross-examination of Rogers, will serve to illustrate:

"Q. How far did your—this accident take place, the impact with the Mitchell car from the rear end of the sedan that was preceding you? A. I don't know. Started off, will say, fifty feet. Q. Started off with that? Shall we regard it at fifty feet or do you want to make it seventy-five? A. Does not make any difference. I didn't measure it. Q. You think though it was about fifty feet? A. I would say so. Q. And it might have been seventy-five? A. Yes. Q. Somewhere in between fifty and seventy-five feet—fifty and seventy-five feet behind the sedan parked behind the pickup which was parked behind the stalled truck? A. Yes. Q. Now, would that be approximately a hundred fifty feet from the rear of the stalled truck? A. I don't know. Well, it could be, yes.

Q. It would be about that? A. I didn't have an opportunity to see the distance between the truck and the sedan after the accident. Q. You said the pickup truck was fifty feet behind the Heimbigner truck, and the truck was about twenty feet long, is it generally speaking? A. I don't know. Q. Assuming it is twenty feet, that would be seventy feet, and then how far is the sedan from the other car, I think you said twenty to twenty-five feet from the pickup? . . . Q. After the accident you saw the pickup truck parked behind the Preston truck? A. Yes. Q. And that was fifty feet behind there was it? Is that what you testified? A. I said that, but it could vary. . . . Q. How far was the pickup truck behind the parked truck after the accident? A. I don't know. Q. You don't know at all? A. Well, after the accident happened, I did not go over and measure the distance or anything. Q. Give us your best estimate. A. Between thirty and fifty feet. Q. Somewhere between thirty and fifty feet that the front of the pickup truck was behind the stalled truck, the Preston truck and then the truck like that was about twenty feet long? A. I don't know. Q. You know how long a car is? A. There are a lot of different cars, a lot of different lengths. Q. You think it would be about twenty? A. Some probably are. Q. Well, assuming that is twenty feet long, then how far was the sedan parked back of the pickup. A. I would say between thirty and fifty feet. Q. That is the sedan behind the pickup thirty or fifty feet. And the sedan probably would be about eighteen feet long? . . . A. I don't know. I never measured one. Q. You never measured one, and you don't have any idea what it would be? A. No. Q. Assuming that is eighteen feet long, adding those up, my figure would be—how far the accident happened behind the parked car, would be fifty to seventy-five feet, you said? A. Behind the sedan? Q. Yes. A. Around about there. MR. BRETHORST: My computation then, Your Honor, adding those up— MR. LEAVY: We object to counsel testifying. THE COURT: It is a matter of addition. I think we can put down the figures. MR. BRETHORST: I can put them on the blackboard. The least would be 148 feet and the farthest 213 feet. MR. LEAVY: May the record show we object to the addition being incorrect first, and allowing counsel to testify without being under oath. THE COURT: Very well. MR. BRETHORST: I think that is all. MR. LEAVY: I object to this procedure. If I may take advantage of same procedure—I am not good at mathematics, but figures add to 148 feet and I think— THE COURT: That is right. A.

Those are his figures, I did not have nothing to do with them."

In view of the obviously leading nature of these questions, the concluding remark of the witness is rather convincing. In any event, in contrast to this testimony was that given by Tate, who, although he admitted that he was not sure of the distance between the truck and the point of the collision, stated, on direct examination, that it was between forty and sixty feet. Appellants would have us disregard this evidence, because, when cross-examined, Tate testified:

"A. Well, they must have hit about thirty-five, forty feet from the rear end of the box of our truck."

However, his answer to a further question on the matter is significant:

"Q. Are you satisfied in your mind that where the impact of these two cars took place couldn't be as much as a hundred and seventy-five feet behind your truck? A. *It couldn't have been that far. That would have been right in the middle of the gully.*" (Italics ours.)

Appellants argue that these statements of Tate had no probative value, because his testimony on various other matters was not in agreement with that of the other witnesses. Thus, he remembered but one vehicle between the truck and the Rogers car, while all of the other witnesses remembered two. But it is not for us, but for the jury, to judge his credibility; and this is so even though his testimony was taken by deposition, for the jury had the opportunity to view the scene of the accident and the terrain involved, and to compare his evidence with that offered by the other witnesses. In addition, it must be remembered that Tate was not only the sole eye-witness not personally involved in the accident, but that he was also the only disinterested witness to testify as to the matter at hand. Clearly, the jury could have believed his testimony that the collision took place within forty to sixty feet of the rear of the truck, and, if they did believe it, they could reasonably have concluded both that Rogers

would probably have seen a warning flag in time to have slowed his vehicle, and that Mitchell did not have sufficient opportunity between the time he passed the truck and the time the Rogers car suddenly swung out into his lane to take full cognizance of the situation, and act accordingly.

■ Where fair-minded men may differ as to the facts, or as to the conclusions to be drawn therefrom, the question of proximate cause is for the jury; otherwise, for the court. 5 Am. Jur. 874, Automobiles, § 669. We think there is ample evidence in the record from which the jury could have found that the accident would not have occurred had the flags been properly placed, and that Preston might reasonably have foreseen that his failure to put them out would result in an accident of this type. Accordingly, the jury could have determined that Preston's negligence in this respect was the proximate cause of the accident.

■ Appellants assert, however, that the evidence demonstrated that Mitchell was contributorily negligent as a matter of law. In order for us to so hold, it would be necessary to find that reasonable minds could not differ upon the facts or the inferences to be derived therefrom. It is undisputed that Mitchell at all times drove on his own side of the road and within the speed limit, probably, indeed, well within it (under the evidence the jury could have found that he was going from thirty to thirty-five miles an hour). But appellants state he should have blown his horn when he realized the truck was parked, in view of the fact, as they allege, that he should have anticipated that some automobile, like the Rogers car, might try to pass the truck on the wrong side of the road. Rem. Rev. Stat., Vol. 7A, § 6360-35 [P.P.C. § 286-3], provides that every vehicle should sound its horn "at any time when such vehicle is approaching a condition of danger or where in the exercise of due care warning should be made." But whether a given situation is one in which a driver should have sounded his horn in warning is ordinarily for the jury. *Zurfluh v. Lewis County*, 199 Wash. 378, 91 P. (2d) 1002. The court submitted the question of whether Mitchell was negligent in this respect to the jury in its in-

struction No. 20, and we have no further concern with the matter here.

■ Appellants assert further that Mrs. Mitchell, a woman seventy years of age, who testified she did not drive, and who was "just looking at the scenery," should have warned Mitchell of the presence of the parked truck, which she saw before he did, in time for him to have stopped his car, or to have taken some of the precautions which appellants regard as essential. But this was also a jury question, and it was properly submitted to the jury in the court's instruction No. 22.

■ Appellants charge that Mitchell was negligent in failing to comply with Rem. Supp. 1949, § 6360-76, which provides as follows:

"Whenever any person operating any vehicle upon any public highway of this state shall meet or approach a vehicle traveling in the opposite direction, such person shall reasonably turn and drive such vehicle as far to the right of the center of such highway as is practicable. . . ."

Surely, however, driving one and one-half feet to the right of the center line of a highway is sufficient compliance with this statute in a normal situation. Mitchell testified that he was that far on his own side, and the jury was entitled to believe him, or, for that matter, Tate, who testified that his car was "clear over on its side of the road." As to whether, in this particular circumstance, ordinary care and prudence should have required that he go over even farther to the right, to the extreme edge of the highway or onto the adjacent shoulder, that, it would seem, was again a question for the jury to determine upon consideration of all of the facts involved. The court included the statute in its instruction No. 7, and it was for the jury to state whether or not it had been violated.

■ Appellants invoke the doctrine of *volenti non fit injuria*. In *Walsh v. West Coast Coal Mines*, 31 Wn. (2d) 396, 197 P. (2d) 233, we stated that the principle underlying this maxim is:

" 'If one knowing and comprehending the danger voluntarily exposes himself to it, though not negligent in so

doing, he is deemed to have assumed the risk and is precluded from a recovery for an injury resulting therefrom. The maxim is predicated upon the theory of knowledge and appreciation of the danger and voluntary assent thereto.' [*Gover v. Central Vermont R. Co.*, 96 Vt. 208, 118 Atl. 874.]"

But the doctrine has its limitations, as is apparent from the case of *Jordan v. Seattle*, 26 Wash. 61, 66 Pac. 114, cited with approval in the *Walsh* case. There, the plaintiff stepped into a hole in a sidewalk and injured herself. The trial court granted a nonsuit, on the ground that the plaintiff had had previous knowledge of the defect in the sidewalk, and could have avoided it by taking another route. This court reversed, saying:

"If the danger arising from the known defect is obviously of such character that no person, in the exercise of ordinary prudence, would attempt to pass over the sidewalk at that point, or over a particular part thereof, or in other words, if such attempt would, of itself, plainly and unequivocally amount to a want of ordinary care and prudence, it may be so decided as a matter of law. *Samples v. Atlanta, supra* [95 Ga. 110, 22 S. E. 135]. Between extremes there is every conceivable kind of danger. Says the supreme court of Georgia:

" 'Where the danger is exceedingly small and trivial it may not be at all negligent to disregard it; where it is exceedingly great and obvious, it would be negligence *per se* to incur the hazard of being injured by it. In other cases, it would be open to question whether incurring such possible or probable hazard would be consistent with ordinary care; and in cases of this kind the question of contributory negligence is one for determination by the jury.' *Samples v. Atlanta, supra.*"

In the present case, had Mitchell been aware that the Rogers car was approaching him in the wrong lane, and had nevertheless elected to continue down the highway, it might possibly be said that he had voluntarily exposed himself to an obvious danger. But, here, it must be remembered that Mitchell was driving in his own lane, and that, according to his testimony, all that he saw coming in the other direction was an automobile which was

slowing down in its proper lane behind the stalled truck. There was always a possibility that another unseen automobile would come suddenly out from behind the one he saw, and strike his automobile. But whether this possibility constituted such a clear danger that he should have acted differently than he did was, we think, clearly a question for the jury. The court's instruction No. 13 submitted the matter to it in the following language:

"You are instructed that one may not cast the burden of his own protection upon another. He owes a duty to himself. The Law does not permit him to close his eyes to danger and then if he is injured as a result of such danger to seek a remedy in damages against another, or be excused from the consequences of his own acts. He must use his own intelligence and faculties for his own protection. If you find from a fair preponderance of the evidence that either of the plaintiffs failed to so exercise his faculties and intelligence and that such failure on his part contributed to the injuries suffered by him, if any, then your verdict must be for the defendant so far as that plaintiff is concerned."

Generally, the question of contributory negligence is for the jury to determine from all of the facts and circumstances of the particular case, and it is only in rare cases that the court is justified in withdrawing it from the jury. *McQuillan v. Seattle,* 10 Wash. 464, 38 Pac. 1119, 45 Am. St. 799; *Gilbert v. Solberg,* 157 Wash. 490, 289 Pac. 1003.

Under the evidence as presented in this case we are convinced that the facts did not conclusively establish contributory negligence on the part of respondent Mitchell, and that the matter was properly submitted to the jury.

Appellants contend that the court erred in giving, and in refusing to give, certain instructions. The court's instruction No. 10, which indicated that the jury could find Preston guilty of negligence, even though Rogers had also been guilty of negligence, is criticized on the ground that it did not mention that respondents' knowledge of Preston's negligence in time to have prevented the accident would break the causal connection and absolve Preston

from liability. But this was a matter of contributory negligence, and the court specifically stated, in the instruction, that Preston would only be liable, in such a situation, if the respondents "were not contributorily negligent as defined in these instructions." Instruction No. 13, which we have previously quoted, submitted to the jury the question of whether Mitchell had used his own intelligence and faculties properly to avoid the accident.

Appellants except to instruction No. 23, by which the jury was told that, if defendant Rogers was driving his automobile in a lawful manner and came suddenly into proximity of the Preston truck, and there was neither time nor space to avoid a collision, then Rogers was not guilty of negligence. But we need not consider whether or not there was error in this instruction, for no appeal has been taken from the verdict exonerating Rogers, and we are not concerned with his negligence or lack of it at this time.

 Whether he was or was not negligent in failing to keep his vehicle under such control that he was able to stop in time to avoid the cars which had in turn stopped to avoid the stalled truck, could not affect Preston's liability, providing, of course, that the jury found Preston's negligence to be a causative factor in bringing about the collision. As the court instructed the jury, when the negligence of one person concurs with that of another to produce the proximate cause of injury to a third person, each of the persons found to be negligent is chargeable as if solely responsible for such cause. *Caylor v. B. C. Motor Transportation*, 191 Wash. 365, 71 P. (2d) 162. 4 Blashfield, Cyclopedia of Automobile Law and Practice, 46, § 2552.

 Appellants have listed ten instructions which they allege should have been given by the court. Neither time nor space permits exhaustive treatment of each of these, but we shall refer to each of them briefly. Appellants' proposed instructions Nos. 19, 25, 26, 27, 29, and 35 dealt with the subject of the effect of respondents' awareness of appellants' alleged negligence in time to have avoided the accident. In so far as they were appropriate, they

were covered by the other instructions given by the court. Appellants' proposed instruction No. 4 was a categorical statement to the effect that Preston was not negligent in stopping where he did. This matter was disputed, and instruction No. 14, given by the court on the same subject, seems, on the whole, to have been fairer.

The only matter in appellants' proposed instruction No. 7, which is not included in instruction No. 7, as actually given, is the statement, "You are further instructed that, under the circumstances, said truck was disabled within the meaning of that statute." Whether the truck was disabled by its flat tire was a matter for the jury, and not for the court, to decide.

The portion of proposed instruction No. 16 which was not given, directed the jury that a person should not anticipate that automobiles approaching each other from opposite directions, "which are or should be in the exercise of reasonable care, in plain view of one another for a distance of approximately one-half mile, will run head on into one another." This, of course, assumed facts which were in dispute. Mitchell's testimony clearly indicated that he did not see the Rogers car until he was almost upon it, and the jury, having viewed the situation, was in a position to judge whether that testimony was correct.

Appellants' proposed instruction No. 34 would have told the jury that the failure of Preston to place signal flags was not a legal cause of the failure of Rogers to stop his car in time, if it found that the driver of the preceding car was able to bring his car to a stop in a reasonable manner without colliding with the Preston truck or with any other intervening vehicle also stopped on the highway. But the giving of this instruction would have been error, if for no other reason than that it is based on the assumption that, if Rogers were shown to be negligent, then Preston could not have been held responsible. However, as we have previously indicated, if the jury had found that negligence of Rogers and Preston concurred in causing the accident, then both would have been equally liable. This instruction was properly refused.

Appellants make much of the supposed inconsistent verdicts which exonerated Rogers but held the other defendants. We again point out that no appeal was taken from the jury's decision with respect to Rogers, and the matter of his negligence *vel non* is not properly before us. However, the present respondents, at the conclusion of the trial, interposed a motion for judgment notwithstanding the verdict exonerating Rogers. The trial judge, in his memorandum opinion, expressed the view that, for reasons which would unnecessarily extend this opinion to set forth here, the jury's finding that Rogers was not negligent had support in the evidence, and was not inconsistent with its verdict holding the other defendants liable.

Particularly if the evidence favorable to respondents is accepted as correct, and we again emphasize that the jury had the right to so accept it, this seems to have been precisely the type of accident which the legislature, in passing Rem. Supp. 1947, § 6360-32a B (3), hoped to prevent.

As we are unable to find any error in the record, the judgment is affirmed.

SIMPSON, C. J., MALLERY, HILL, and HAMLEY, JJ., concur.