418 P.2d 120

James BRAND and North American
Van Lines, Inc., Appellants,

v.

J. H. ROSE TRUCKING COMPANY and
Marion M. Hawkins, Appellees.*

No. 1 CA–CIV 287.

Court of Appeals of Arizona.

Sept. 14, 1966.

Rehearing Denied Oct. 3, 1966.

Review Granted Nov. 1, 1966.

* This appeal was filed with the Arizona Supreme Court and assigned that court's No. 7405. The matter was referred to this court pursuant to A.R.S. section 12–120.23.

Shimmel, Hill, Kleindienst & Bishop, by Merton E. Marks and Richard A. Black, Phoenix, for appellants.

Chandler, Tullar, Udall & Richmond, by Thomas Chandler, Tucson, for appellees.

MOLLOY, Judge.

This is an appeal by the plaintiffs from a verdict directed for the defendants and from a denial of the plaintiffs' motion for a new trial. The ultimate question for review is whether the trial court erred in taking the case from the jury. In this regard, plaintiffs contend that (1) plaintiffs established negligence per se on the part of the defendants and (2) that "There is sufficient evidence in the record from which the jury could conclude that but for the negligence of the defendants, the accident which destroyed the property of the plaintiffs would not have occurred."

Facts are critical to the determination of this appeal, and will be viewed in the light most favorable to the party against whom the verdict was directed. Nieman v. Jacobs, 87 Ariz. 44, 347 P.2d 702 (1959). In a negligence action, it is incumbent upon the plaintiff to present evidence from which it may be reasonably inferred that negligent conduct on the part of the defendant was a proximate cause of the plaintiff's injuries, Rosendahl v. Tucson Medical Center, 93 Ariz. 368, 380 P.2d 1020 (1963), so that it may be preliminarily stated that if there is any such evidence the case should have been submitted to the jury for its decision. Figueroa v. Majors, 85 Ariz. 345, 338 P.2d 803 (1959).

A collision occurred between a North American Van Lines truck, being driven by the tractor-owner James Brand, in a westerly direction, and a 1949 Plymouth automobile driven in an easterly direction by Francis or Sally Williams, October 18, 1958, on US Highway 80, about 17 miles west of Benson, Arizona, at 7:15 a. m.

The accident occurred between a bridge over Cienega Wash and a railroad overpass 708 feet east of the easternmost edge of the Cienega Wash Bridge. The highway at the scene of the accident is 33 feet 10 inches wide. The south, or eastbound, lane is 19 feet 10 inches wide. The point of impact between the North American Van Lines truck and trailer driven by plaintiff, James Brand, and the 1949 Plymouth driven by Francis Williams or Sally Williams, was 56 feet east of the east end of Cienega Wash Bridge, and approximately 5 feet north of the center strip separating the two lanes of traffic, that is, in the North American Van Lines lane of traffic.

At the time of the accident, the defendant Rose Company's truck and trailer were parked towards the right side of the road

in the eastbound lane between the Cienega Wash Bridge and the railroad overpass. The vehicle had stopped because it was unable to pass under the railroad track by reason of an over normal height load (a crated wing of a jet aircraft). The defendants' truck and trailer were not physically involved in the collision which occurred, but the plaintiffs contend that the manner of the parking of this rig in the eastbound lane was one of the causes of the accident.

Other litigation involving this same accident has been before us. In Finn v. J. H. Rose Truck Lines, 1 Ariz.App. 27, 398 P.2d 935 (1965), an action brought by the special administrator of the Estate of Francis and Sally Williams against the Rose Company, appellees, we affirmed a verdict directed in favor of the Rose Company, holding that there was insufficient evidence of negligence on its part to make out a jury question. The evidence elicited in that action, and the contentions made therein, are sufficiently distinct from the matters before us in this appeal that the Finn decision is not controlling.

 As to the appellants' contention that there is sufficient evidence to go to the jury on the question of the defendants' negligence, we agree. We have evidence in this case which was lacking in Finn v. Rose Truck Lines, supra. An eyewitness (Brand) estimated that the Rose truck was 3 feet from the south curb, which might be considered by a jury to be not as far as practicable off the highway. See A.R.S. § 28–871, subsec. A. Additionally, we have here the overheight permit in evidence, which clearly requires the permittee to "* * * detour underpasses." The driver of the Rose truck failed to do this, though he had reason to know there would be insufficient clearance at this underpass, having traveled the highway many times. Additionally, our attention has been called to a pertinent regulation of the Arizona Corporation Commission, which adopts the Safety Regulations of the Interstate Commerce Commission. Section 192.26 of these safety regulations requires that under the

situations pertinent to this case, red flags should have been placed in the center of the traffic lane, approximately 100 feet to the rear and 100 feet to the front of the parked vehicle. There is no dispute but what Hawkins, the driver of defendants' truck, failed to post such flags. The question remains, however, as to whether there was sufficient evidence that any negligent conduct of the defendant was a proximate cause of injury to the plaintiffs. Shetter v. Rochelle, 2 Ariz.App. 358, 409 P.2d 74 (1965).

There was available at the time of trial the testimony of two eyewitnesses, Brand, driver of the North American Van truck, and Thomas Traynor, driver of a passenger car which was following the Williams vehicle at a distance of five to six car lengths. After the collision in question, the Williams car was thrown back into the eastbound lane in such manner that the Traynor vehicle was unable to avoid being hit thereby. The testimony of Mr. and Mrs. Williams was unavailable, as they were instantly killed in the collision, with their bodies being thrown out of their vehicle so that it was impossible to determine which of them was driving their Plymouth passenger car.

Brand testified that he first saw the Rose truck as he passed under the railroad overpass, that he was first aware that the Rose truck was stopped when he passed it, that as he "* * * came on down past the truck * * *" there was a "* * * little congestion" in the traffic, that this was caused by a little car that was stopped behind the truck in a position as if to pass and, because of the importance of the testimony, we now go to the transcript to continue with the testimony of the witness Brand:

"Then I went on by, and as I went on by the truck and the little car, this other car was coming across the bridge, and just as I went by him, he appeared to me as if he had everything under control. He was driving normal, and all of a sudden, he just came right out and ran right into me. He was about a 45-degree angle when he came out."

Brand testified as to the speed of the Williams car as follows:

"Q And the Williams car is somewhere down the road approaching you at about the same speed that you are approaching it, is that correct?

"A Yes.

"Q You fix the speed of both vehicles about the same. Did the Williams car ever slow down appreciably or materially until it shot across the road at you?

"A I couldn't answer that.

"Q It didn't appear to, Mr. Brand?

"A No.

"Q Didn't the Williams vehicle maintain the same speed, go into a skid, and come right at you at roughly the same speed?

"A Well, if he was skidding, he would have to be slowing down. I couldn't say yes to that. I couldn't give you—

"Q What do you think the speed of the car was at the moment it collided with you, the Williams car?

"A. I would estimate around fifty miles an hour."

Brand further testified:

"Q Didn't you have the impression at all times before it actually shot across the road that he had plenty of room to stop before he collided with anything?

"A I thought he would have stopped, yes."

Subsequently, he further testified:

"Q Referring to 9 for identification, as you approached and passed the Rose truck, did you maintain pretty nearly the same line of travel, or did you give ground to your right?

"A Well, I moved slightly to the right, giving as much room, seeing how the highway was so congested and everything, I moved slightly to the right, I would say two or three feet, to allow maximum distance between us."

The following are excerpts from the testimony of the eyewitness Traynor:

"Q Now tell the jury in your own words, Mr. Traynor, what happened after you had seen the things you said you saw up ahead of you?

"A The Plymouth [the Williams car] which I was following started to pull out to pass.

"Q Pardon me, now. Let me interrupt you. I hate to keep doing it, but it might save some time. What is your best opinion as to the speed of the Plymouth?

"A I can't judge the speed of the Plymouth.

"Q Do you have any idea whether it was going slower or faster than your car?

"A Approximately the same speed. [Traynor had estimated his speed as 55 miles per hour.]

"Q All right. You said it pulled out to pass. Was there another vehicle in front of the Plymouth?

"A Yes, there was.

"Q Where was the Plymouth at that time? Was it on or off the bridge?

"A It was near the end of the bridge.

"Q On or off?

"A I think it was right near the end of the bridge. I am not sure.

"Q Then tell the—Withdraw the question. The car in front of you, was it going at approximately the same speed as the Plymouth, slower or faster?

"A The car in front of the Plymouth was moving slower.

"Q All right. Then tell the jury what occurred after that?

"A The Plymouth pulled back in and hit his brakes—I could see his brake lights —to keep from hitting the car in front of him, and then the car swerved into the other lane.

"Q Now, 'the car,' which car is that?

"A The '49 Plymouth.

"Q Did you see a van line truck, a North American Van Lines truck, ap-

proaching as the Plymouth started out to pass?

"A Yes, I did.

"Q What did you do the minute the Plymouth started out to pass?

"A I hit my brakes then.

"Q Did you hit them full force?

"A Yes, I believe I did.

"Q Did you actually skid the wheels of your car?

"A Yes, I did.

"Q And did you keep skidding the wheels of your car until your car came to a complete stop?

"A Yes, I did.

"Q Why did you skid the wheels of your car when the Plymouth pulled out to pass?

"A Because I seen that he couldn't make it if he started to go on around the car.

"Q What was he going to collide with?

"A If he had of kept going, he would have hit the North American Van Lines truck.

"Q And I believe you said that then he did collide with the truck?

"A Yes, he did.

"Q All right. Tell the jury how that happened, would you, please?

"A The car just seemed to—*The '49 Plymouth seemed to swing into the other lane in front of the truck.*

"Q *Pardon me, was it a sudden movement or gradual?*

"A *It seemed to be a sudden movement.*

"Q About what angle did the Plymouth pull out into the other lane of traffic?

"A I couldn't say.

"Q Did your car ever collide with either the North American Van Lines truck or the other car?

"A After the Plymouth was hit by the truck, it was knocked backwards into my car.

"Q Were you stopped or moving at this time?

"A My car was stopped." (Emphasis added)

The eyewitness accounts of a sudden turn to the left by the Williams car are corroborated by the physical facts portrayed in pictures taken at the scene of the accident. These show the Williams and Traynor cars at rest after the accident, and indicate that the Williams car was hit on the *right* front side, so that the right front was caved into the left side of the vehicle with the engine being shoved to the left. Marks on the pavement indicate that the Williams vehicle made an approximately 270 degree turn to the left as it spun backwards into the eastbound lane, to make contact with the Traynor vehicle as it skidded to a stop. Skid marks 93 feet in length were traced by the highway patrolman to the Traynor vehicle as it was at rest. A single skid mark beginning 76 feet back on the bridge and ending at the edge of the bridge, approximately 50 feet from the point of impact, were attributed by the officer to the Williams vehicle. From the bridge to the point of impact, the skid mark supposedly of the Williams car was light and difficult to follow. There is a picture in evidence of the skid marks on the bridge, which shows the Traynor skid marks and the skid mark attributed to the Williams car. This latter mark begins approximately 2 feet south of the center line and angles towards the center line until approximately the last 10 feet, where the skid mark appears to turn parallel to the center line about 6 inches south of the center line. The mark fades out on this parallel course at the end of the bridge, and there are no skid marks tracing the path of this vehicle over into the opposite lane of traffic and the point of impact 56 feet away.

There is contention in the briefs as to how far east of the collision the defendants' rig was parked at the time of the accident.

The highway patrolman who investigated the accident arrived at the scene twenty to thirty minutes after the accident. At that time he found the rear-end of the defendants' trailer to be 300 feet from the southeast edge of the Cienega Wash Bridge. According to other measurements made by him, this would place the point of impact to be 250 feet west of the rear-end of the rig.

After the accident in question, the Brand truck proceeded on down the highway for approximately 200 feet hitting the Cienega Wash Bridge on both sides, with the tractor finally breaking through the concrete escarpment and ending up in the bottom of the Cienega Wash, which was about 25 feet below the level of the highway on the bridge. The trailer, loaded with furniture, ended up on its side in the middle of the bridge, blocking all traffic. Miraculously, Brand was able to walk way from the accident with minor injuries. Brand estimated that it took him five minutes to get back up on the highway. He was asked if the Rose truck was in the same spot at the time of the accident as it was when he got back on top, to which he responded: "I guess it was. I am sure it was." Hawkins, the driver of defendants' vehicle testified that his truck was not moved between the time of the accident and the time the highway patrolman arrived. Mr. Traynor's testimony is in accord.[1]

Plaintiffs argue on appeal that there is credible evidence that the Rose truck was moved further to the east between the time of the accident and the time of the arrival of the highway patrolman. This contention finds support, if there be support in the record, in the testimony of the plaintiff Brand, and of a Mrs. Jennings, a friend of the Williams, who was traveling in another car some distance ahead of the Williams car.

On direct examination, Brand testified that the Rose truck was stopped " * * * 200, 300 feet, * * * about 200, I guess" feet west of the underpass. This testimony would be in substantial agreement with the testimony of Traynor and the measurements of the highway patrolman. Opposed to this, however, is later testimony of Brand pertaining to his estimates of the distances as he was driving immediately prior to the collision. He testified that the little car was in a position as " * * * though he could pass * * *" and was about 30 feet behind defendants' truck and that he went 30 or 40 feet past this car when the accident occurred. On the basis of this, Brand estimated that the Rose truck was about 60 feet up the road from the point of collision. Subsequently, Brand estimated that the defendants' truck was 150 feet from the bridge at the time he passed it. The deposition of this witness taken in September of 1960 was read into the record and it showed that Brand had testified at that time that the Rose truck was parked 40 feet from the railroad underpass (which would place it some 650 feet to the east of the accident). At no time did Brand state that he was of the impression that the defendants' rig had been moved after the accident and before the patrolman arrived.

Mrs. Jennings testified that she and her husband were traveling in a separate car but in concert with the Williams car to go out on a rock hunting expedition. They

1. Specifically, Traynor's testimony in the transcript on this point is as follows:

"Q About how far was it from the end, the east end, of the bridge, the truck parked, or how far was it when you first saw it?

"A. It was about half-way between the bridge and the underpass.

"Q That is before the accident occurred?

"A Before the accident occurred.

"Q How far was it after the accident occurred?

"A It was approximately in the same position.

"Q Did it move at all at any time from the time you first saw it until you left the scene of the accident as far as you know?

"A As far as I know, it didn't.

"Q Did you see it as you left?

"A Yes, I did.

"Q Was it in your judgment in the same position as it was when you first saw it?

"A I believe it was."

had last seen the Williams car behind them perhaps ten minutes before arriving at the Cienega Bridge. She testified that there was a truck " * * * loaded pretty high" parked on the pavement just past the bridge. She estimated the distance between the parked truck and the bridge to be 50 feet, but, in cross-examination, she was unable to say how far the truck was parked from the railroad overpass or whether this distance was more or less than the distance the truck was parked from the bridge. After passing, the Jennings drove on for several miles, parked, and when traffic failed to pass them going east, they went back to the scene of the accident. They remained there until some twenty or thirty minutes after the highway patrolman investigating the accident had arrived. Mrs. Jennings testified that at this time, after the highway patrolman was on the scene, the truck appeared to be parked in the same place as when they had first gone past it. The highway patrolman testified the truck was not moved while he was there.

Thus, no witness testified to an impression that the defendants' rig had been moved between the time that he first saw it and the time the highway patrolman measured its position. The estimates of distances relied upon to discount this measurement are expressions of mental impressions gained by the witness while in a moving vehicle. The very same witnesses who gave their impressions testified that in their opinion the truck had not been moved. Other utterances of the very same witnesses demonstrate that the estimates relied upon by appellants were inaccurate. While the judging of the credibility of witnesses is for the jury, we hold that under these circumstances the trial court was justified in accepting the measurement of the highway patrolman as being the undisputed position of the truck prior to the accident. Motors Insurance Corporation v. Rhoton, 72 Ariz. 416, 419, 236 P.2d 739 (1951); Cope v. Southern Pacific Company, 66 Ariz. 197, 204, 185 P.2d 772 (1947).

The direct and immediate cause of this accident, without which the accident would not have occurred, was the sudden 45 degree turn to the left of the Williams car. Unless the defendants caused this turn, there appears to be no causal connection between the defendants' conduct and the accident. Neither Brand nor Traynor in his eyewitness description tended to connect the sudden turn to the left with the parked truck ahead. The highway in question is straight and the defendants' rig was clearly visible for three-quarters of a mile coming from the west. The highway in question is wide enough so that even with the defendants' truck parked 3 feet from the curb, there was room (approximately 9 feet) for a car to pass without crossing the center line. Brand testified that he had pulled over to the right, so there was even more passing room available. The Traynor vehicle was traveling at approximately the same speed as the Williams car and applied its brakes immediately after, but, according to the marks on the pavement, in approximately the same physical location of the highway as the Williams car. The Traynor vehicle was able to come to a full stop 50 feet before the point of impact. At the time of impact, the Williams car was still traveling at apparently normal speed.

The manner of the occurrence of this accident is so strange as to suggest serious mechanical failure or failures in connection with the Williams car, physical seizure as to the driver of the Williams car, and/or other possible causes not attributable to the defendants' conduct. To attribute this accident to the defendants' negligence is to speculate. Rational inferences do not tend to indicate that the parking of the defendants' truck was more probably the cause of the sudden turn to the left than other possible causes for which the defendants bear no responsibility. Under these circumstances, proof of causal connection fails as a matter of law. Pena v. Stewart, 78 Ariz. 272, 278 P.2d 892 (1955); Owl Drug Company v. Crandall, 52 Ariz. 322, 80 P.2d 952, 120 A.L.R. 1521 (1938);

Salt River Valley Water Users' Ass'n v. Blake, 53 Ariz. 498, 90 P.2d 1004 (1939).

The appellants rely upon the decision of Mitchell v. Rogers, 37 Wash.2d 630, 225 P. 2d 1074 (1950), a case with a strikingly similar fact situation. In the *Mitchell* case, however, the pavement was 20 feet wide as opposed to 33 feet 10 inches, as in the instant case. There was evidence in *Mitchell* that the defendant's truck was parked as close as 2½ feet to the center line of the pavement. Putting the Rose truck 3 feet from the right-hand curb, leaving approximately 9 feet to the center line, exhausts the evidence in the plaintiffs' favor on this score in the instant case. Measurements here are more similar to those in Bracy v. Lund, 197 Wash. 188, 84 P.2d 670 (1938), a decision distinguished in *Mitchell.* We believe *Mitchell* also to be distinguishable by reason of the peculiarities of the maneuvering of the Williams car which are described above.

The judgment of the trial court is affirmed.

KRUCKER, C. J., concurs.

NOTE: This cause was decided by the Judges of Division Two as authorized by A.R.S. section 12–120, subsec. E.

HATHAWAY, Judge (dissenting):

In their prologue the majority announces that the facts " * * * will be viewed in the light most favorable to the party against whom the verdict was directed." When so viewed, I believe the record contains competent evidence which would support a verdict in favor of the appellants. And I believe the court has invaded the province of the jury.

Addressing first the problem of proximate cause, since this is our principal area of disagreement, the provision of the over height permit requiring that underpasses be detoured and the regulation requiring the posting of red flags was calculated to avoid traffic congestion and to prevent harm of the precise nature of the occurrence. We agree that the immediate cause of the collision was the sudden 45 degree turn of the Williams vehicle to the left. It may reasonably be inferred from the evidence that the Williams vehicle took evasive action to the left to avoid collision with traffic attempting to pass the parked Rose truck, or to avoid collision with the Rose truck itself. Indeed, it is presumed that a person killed in an accident exercised due care, Robledo v. Kopp, 99 Ariz. 367, 409 P.2d 288 (1965); 22 Am.Jur.2d 761 Death § 215.

Eye witnesses testified that they thought that the Rose truck was in motion. Had the red flags been posted, approaching traffic would ordinarily respond defensively and proceed with greater caution.

The Supreme Court of the State of Washington considered a like situation in Mitchell v. Rogers, supra. In affirming a judgment for the plaintiff, the court held that the jury could have found the truck operator's failure to place warning flags by the stalled vehicle, as required by statute, was the proximate cause of the head-on collision between the oncoming cars. The Washington court said:

" * * * the jury could have concluded that, had warning flags been properly placed, the actions of any of the drivers involved would have been altered sufficiently to have prevented the accident."

The majority compares various measurements in *Mitchell* with those in the instant case and notes the dissimilarity. The appellants in *Mitchell* contended there was plenty of room for oncoming cars to pass, but the Washington court never dealt with this contention. I would distinguish *Bracy,* supra, for the same reason that the court in *Mitchell* did—warning flares had been placed around the vehicle.

Simply because the Williams vehicle veered suddenly to the left at a sharp angle, may we speculate that such action was possibly caused by something other than defendant's negligence? How is the court able to determine as a matter of law that the angle of the turn is too sharp to have been responsive to the negligently created

situation? Believing it has rescued the jury from speculating, the majority has itself wandered into fields of conjecture and there indulged in a spree of speculation. They surmise that the accident occurred in such a strange manner " * * * as to suggest serious mechanical failure or failures in connection with the Williams car, physical seizure as to the driver of the Williams car, and/or other possible causes not attributable to the defendants' conduct." I am unable to glean from the record evidence to support any such theories.

The cases cited by the majority do not invite courts to speculate whether there may be other possible causes unsupported by the evidence. In *Pena* the court found that the record disclosed no evidence of negligence and held that the trial court therefore properly had directed a verdict. In *Owl Drug Co.* the court held that the plaintiff could not recover where the evidence showed that her injuries may have resulted from one of several causes, only one of which could be attributed to the defendants' negligence. In the case of *Salt River Valley Water Users' Association* the court determined that there was no evidence in the record showing that the plaintiff was negligent by failing to determine that the irrigation ditch had been clogged.

The trial court and my brethren of the majority, I believe, have overstepped their proper function in this case and have snatched from the appellant the right to have the jury determine the critical factual issues.

The Restatement, Second, Torts provides:

" § 328 B. Functions of Court

"In an action for negligence the court determines

* * * * * *

"(e) the applicability of *any rules of law* determining whether the defendant's conduct is a legal cause of harm to the plaintiff; * * *" (Emphasis supplied)

" § 328 C. Functions of Jury

"In an action for negligence the jury determines, in any case in which different conclusions may be reached on the issue:

* * * * * *

"(c) whether the defendant's conduct is a legal cause of the harm to the plaintiff, * * *"

In an analogous situation, the Missouri Supreme Court in Cox v. Wrinkle, Mo., 267 S.W.2d 648 (1954), held that whether defendant's negligence in parking his automobile was a proximate cause of plaintiff's injury was a question for the jury. There, one defendant while driving around the other defendant's parked automobile, collided with plaintiff's oncoming automobile.

Prior to concluding that the distance from the point of impact to the parked Rose truck is unimportant—again I disagree—my colleagues traverse quite a course of sifting and weighing of the evidence. For example, Brand and Mrs. Jennings testified that the Rose truck was parked, shortly before and at the time of the accident, at a location approximately 60 feet away from the point of impact. Should an appellate court discard such testimony as "* * * expressions of mental impressions gained by the witness while in a moving vehicle"? Such treatment does violence to the proposition that evidence will not be weighed on appeal. If there is a conflict in the evidence and competent evidence is present which would support a verdict in favor of the appellants, the trier of the facts should determine the facts.

The majority upholds the trial court's acceptance of the measurement of the highway patrolman, taken approximately one-half hour after the accident, as being the undisputed position of the truck prior to the accident. They discard the testimony of Brand and Mrs. Jennings, citing *Motors Insurance Corporation* and *Cope*. Though the opinion does not say so, I presume that the measurements taken by the highway patrolman are likened to a conclusive physical fact such as the photograph referred to in the

**134**

*Cope* case. Assuming that the measurements were accurate, they showed only the distance of the Rose Company truck from the established point of impact one-half hour after the accident. Considering the evidence in the light most favorable to appellants, and accepting as true the previously indicated testimony of Brand and Mrs. Jennings, the inference reasonably follows that the Rose Company truck was moved after the collision.

For the reasons indicated I believe that the judgment of the trial court should be reversed and the cause should be remanded for a new trial.